**INTERMEDICS, INC., a Texas corporation, Plaintiff,**

v.

**VENTRITEX, INC., a California corporation; Michael Sweeney, an individual; and Benjamin Pless, an individual, Defendants.**

No. C 90 20233 JW (WDB).

United States District Court, N.D. California.

April 30, 1993.

---

**636**

Jeffrey Olson and Robert Weiss of Lyon and Lyon, Los Angeles, CA, for plaintiff.

John Keker and Jeffrey Chanin of Keker & Brockett and Henry Bunsow of Brobeck, Phleger & Harrison, San Francisco, CA, for defendants.

ORDER AND OPINION RE DEFEN-DANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS BASED ON DISCLOSURE OR USE OF ALLEGED TRADE SECRETS OR CONFIDENTIAL INFORMATION

BRAZIL, United States Magistrate Judge.

## I. PRINCIPAL ISSUE ADDRESSED

While defendants' motion for summary judgment and plaintiff's opposition constrain us to confront many questions, by far the most difficult and significant issue that we address is this: under California law, when a cause of action accrues against a given defendant for misappropriation of some alleged trade secrets or confidential information, does the statute of limitations also begin to run from that time on possible claims against the same defendant for misappropriation of *other* alleged trade secrets or confidential information, without regard to whether there is evidence that the defendant has disclosed or used any of those other alleged secrets? This is an issue of first impression. We do not suggest that its resolution would be the same in all factual settings.

In the circumstances presented here, however, where all the alleged trade secrets (or confidential information) are related to one highly specialized and complex product whose features and components are interdependent, where plaintiff alleges that all the trade secrets (or confidential information) were acquired during the same period, by the same two defendants, and from the same source (plaintiff), where all the alleged misappropriations were committed in connection with the development by those same defendants of one or two similar products for a known competitor, and where misappropriation of those alleged trade secrets as to which the statute clearly has run would have constituted such a clear breach of the confidential relationship that a plaintiff who had actual or constructive knowledge of the misappropriation would have been on notice that its other confidences were at risk, we hold that when the statute of limitations began to run on claims for misappropriation of some of the alleged trade secrets it simultaneously began running as to claims for alleged misappropriations of the other, related secrets, even if no acts of misappropriation of the other secrets had yet occurred.

After describing the procedural and factual background in which we are working, we address the first and more straightforward portion of defendants' motion, i.e., the contention that, given the jury's findings, plaintiff is forever barred by the statute of limita-

tions from litigating any claims arising out of misappropriations of any of the six design ideas (alleged trade secrets) that were the subject of the trial in November and December of 1992. We then turn to the substantially more demanding issue described in the preceding paragraph.

For reasons we detail in sections that follow, we GRANT defendants' motion for SUMMARY JUDGMENT, holding that the statute of limitations bars prosecution against these defendants of any claims arising out of or dependent on any alleged misappropriation of any of the alleged trade secrets or confidential information reached by plaintiff's claims in this litigation.

Having so held, we have no·occasion to reach defendants' second contention, that the doctrine of res judicata also bars prosecution of any claim arising out of misappropriation of the alleged trade secrets or confidential information.

## II.  PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff first sued these same defendants in 1985.[1] In that earlier litigation, plaintiff alleged that defendants Pless and Sweeney were duty bound not to disclose alleged trade secrets and confidential information about an implantable defibrillator on which Pless and Sweeney had worked while employed at Intermedics. Plaintiff further alleged that Pless and Sweeney had violated their duties to Intermedics by disclosing alleged secrets about the implantable defibrillator to Ventritex and by participating in a conspiracy with Ventritex to misappropriate those secrets. In addition, Intermedics asserted that Ventritex had induced Pless and Sweeney to breach their obligations to Intermedics by disclosing it trade secrets or confidential information about its implantable defibrillator to Ventritex and that Ventritex also was guilty of misappropriation.

In sum, the 1985 complaint alleged breaches by these same defendants of the same duties that underlie the allegations in the instant action. Moreover, those breaches purportedly arose out of misappropriations of secrets related to the same project that is the subject of this case (the implantable defibrillator project). After limited discovery, the parties to that earlier action agreed to participate in an informal audit process that was designed to give plaintiff, through a former employee (William Winstrom) and its outside counsel, an opportunity to determine whether defendants had in fact misappropriated any of the secrets to which plaintiff laid claim.[2] After Mr. Winstrom completed his audit, using a list of trade secrets prepared by plaintiff but somehow lost during the intervening years, plaintiff elected to dismiss its·first lawsuit, with prejudice. That dismissal was effective April 10, 1986.[3]

More .than four years later, on April 23, 1990, plaintiff filed the instant action against the same defendants, pressing claims, among others, of the same general character that plaintiff had pressed in the earlier litigation. More specifically, the complaint in this action includes causes of action for misappropriation of trade secrets and confidential information, breach of contract, breach of fiduciary duty, unfair competition, inducement to breach contractual obligations and fiduciary duties, and civil conspiracy. The viability of each of these state law claims turns on whether plaintiff can prove that certain design ideas (all of which were features or aspects of an implantable arrhythmia control device) were its trade secrets or confidential information and that defendants misappropriated them.

1. Plaintiff originally filed this lawsuit on December 5, 1985 in the District Court for Brazoria County, Texas, Civil Action No. 85G–3335. On February 6, 1986, this action was transferred to the U.S. District Court for the Northern District of California. No. C–85–20737 (RPA).

2. On March 5, 1986, the Honorable Robert P. Aguilar filed a stipulation and order staying discovery and other proceedings and establishing the terms of an informal audit of Ventritex, Inc. by William Winstrom.

3. The Honorable William W. Schwarzer filed a stipulation of dismissal and order on April 10, 1986, which stated, "It is hereby stipulated, by and between the parties hereto, through their counsel, that this action shall be dismissed with prejudice as to any and all claims asserted or threatened up to the date of this dismissal. Each side shall bear its own costs." ·

During the pretrial period plaintiff had some difficulty deciding how many separate design ideas it would claim as its trade secrets and how to articulate or define those ideas. In the spring of 1991 plaintiff presented a list of some 39 alleged trade secrets. In the fall of that year, however, plaintiff recrafted its list, adjusting the phraseology describing some of its alleged trade secrets and adding claims, so that the list of allegedly misappropriated trade secrets had grown to fifty (50). Later, plaintiff further refined its list by adding yet another alleged trade secret. In the Spring of 1992 plaintiff deleted two of the design ideas from the list, then, some weeks later, announced that it would pursue claims based on only 37 of the alleged trade secrets.

As the case development process proceeded it became clear to the court that the subject matter of each alleged trade secret was extremely technical (involving dimensions or features of sophisticated electronic micro-circuitry) and that resolving the issues raised by the trade secret claims would require the trier of fact to comprehend an intimidating new vocabulary as well as esoteric scientific and engineering literature. In the court's view, it was unrealistic to ask one jury in one trial to attempt to absorb, comprehend, and organize all the technical and nontechnical evidence that it would have been necessary to admit if we were to attempt to try all the different state law claims based on all the 37 alleged trade secrets in one setting.

Thus, the court ordered a staged adjudicatory process in which the first trial would be limited to the liability issues (not damages) with respect to only six of the alleged trade secrets. The court permitted plaintiff to select any four of its alleged trade secrets for this first trial; defendants selected from plaintiff's list the remaining two alleged secrets that would be the subject of the trial. Before the parties selected the design ideas for this first trial the court expressly admonished counsel that this first adjudication of the issues raised by the claims and defenses related to the six design ideas might well have preclusive effects on issues related to other design ideas or even for the patent aspects of the case. In response to pretrial motions, the court ruled that California law would control disposition of all statute of limitations issues with respect to all claims arising out of or dependent on alleged misappropriations of trade secrets or confidential information. Order, filed 10/30/92. The court also ruled that Texas law would control disposition of the substantive liability issues, e.g., would fix the definition of a "trade secret" and of "misappropriation." [4] *Id.*

4. The court orally articulated some of the bases for its choice of law decisions during three hearings in October 1992. *See* official records for hearings held on October 9, 1992, October 16, 1992, and October 21, 1992. Because of the press of other work necessary to prepare for the trial, however, the court could not write the lengthy opinion that would have been required to explain fully the reasoning that supported the multitude of choice of law rulings. *See* Minute Order, filed 1/7/93.

We note here that the court determined that Intermedics had entered contracts with Pless and Sweeney that included valid choice of law clauses. The clause from the applicable contract stated that the "[a]greement will be governed, construed, and enforced according to the laws of the State of Texas." *See* Agreement Respecting Implantable Defibrillator, Signed by Benjamin Pless and accepted by Intermedics, Inc. on Jan. 12, 1984. Applying an analysis very recently mandated by the California Supreme Court in *Nedlloyd v. Superior Court*, 3 Cal.4th 459, 11 Cal. Rptr.2d 330, 834 P.2d 1148 (1992), we held that, with the exception of statutes of limitations issues, Texas law applied to the claims against Pless and Sweeney. *See also Ashland Chemical Co. v. Provence*, 129 Cal.App.3d 790, 793–95, 181 Cal.Rptr. 340 (1982).

As to defendant Ventritex, which was not even arguably subject to a choice of law clause in a contract with plaintiff (Ventritex never had any contractual relationship with plaintiff), the court followed *Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974), and its progeny, under which California courts use a governmental interest analysis to resolve choice of law issues that are not the subject of an enforceable choice of law clause in a contract. *See also Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978). Under this analysis, we determined, *inter alia*, that Texas law should be used to define the terms "trade secret" and "misappropriation," but that California law should govern disposition of issues related to the statutes of limitations. *See Magnecomp Corp. v. Athene Co.*, 209 Cal.App.3d 526, 539–40, 257 Cal.Rptr. 278 (1989) (upon which the court relied, in part, in ruling that Texas law governed definitions of trade secrets and misappropriation) and *Ashland Chemical Co.*, 129 Cal.App.3d at 794–95, 181

*Results of the 1992 Jury Trial*

Between November 17, 1992 and December 15, 1992, the court presided over a jury trial in which the parties litigated liability issues as to six of the alleged trade secrets (design ideas number 4, 13, 22, 25, 36, and 43). Responding to special interrogatories after all the evidence and argument had been presented, the jury made the following findings of fact:

1. Defendants had proved that William Winstrom acted as Intermedics' agent when he conducted the audit of Ventritex in March of 1986. (Special Interrogatory 1);

2. Plaintiff failed to prove that any of the six design ideas was "secret" at the time that Mr. Pless and Mr. Sweeney stopped working for Intermedics (June of 1985) (Special Interrogatories I.A.1., II.A.1., III.A.1., IV.A.1., V.A.1., VI.A.1.);

3. Defendants proved that all six of the design ideas were disclosed in documents that were available to William Winstrom during the March 1986 audit (Special Interrogatories I.F.1., II.F.1., III.F.1., IV.F.1., V.F.1., VI.F.1.);

4. Defendants proved that all six of the design ideas were disclosed in documents that were available to Intermedics and its counsel or that were discoverable by Intermedics and its counsel in the earlier lawsuit [5] (Special Interrogatories I.F.2., II.F.2., III.F.2., IV.F.2., V.F.2., VI.F.2.);

5. Ventritex proved, by a preponderance of the evidence, that, after August 10, 1992, no reasonable person who had access to the information about the claims in this case that was available to Intermedics and its counsel could have believed that there was any merit in any of the six trade secret misappropriation claims against Ventritex. (Special Interrogatories I.D.14.a., II.D.14.a., III.D.14.a., IV.D.14.a., V.D.14.a., VI.D.14.a.);

6. Ventritex proved, by clear and convincing evidence, that, after August 10, 1992, the dominant and driving purpose that led Intermedics to continue the claim that Ventri-

tex misappropriated design idea 43 was improper. (Special Interrogatory VI.D.14.b.).

The jury concluded that Ventritex had not proved by clear and convincing evidence that such a purpose drove prosecution of the other five trade secret misappropriation claims against Ventritex after August 10, 1992. (Special Interrogatories I.D.14.b., II.D.14.b., III.D.14.b., IV.D.14.b., V.D.14.b.)

There is ample evidence in the trial record to support these jury findings.

## III. GIVEN THE JURIES' FINDINGS, DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT, BEFORE PLAINTIFF FILED THE INSTANT ACTION, THE STATUTE OF LIMITATIONS HAD RUN ON ALL CLAIMS ARISING OUT OF OR DEPENDENT ON ALLEGED MISAPPROPRIATION OF THE DESIGN IDEAS THAT WERE THE SUBJECT OF THE 1992 TRIAL

During the jury trial late last year Intermedics pressed claims against defendants Pless and Sweeney on several different legal theories with respect to each of the six design ideas that were made the subject of those proceedings. Intermedics attempted to prove that each design idea was a trade secret or, failing that, was at least confidential information, and that unauthorized disclosure or use of each design idea simultaneously established liability for misappropriation of a trade secret or confidential information as well as for breach of both contractual and fiduciary obligations.

The claims that Intermedics pressed against defendant Ventritex during the 1992 trial included misappropriation of trade secrets or confidential information, unfair competition under California Business and Professions Code section 17200 et seq., and inducing defendants Pless and Sweeney to misappropriate trade secrets or confidential information (again, in the form of the six de-

---

Cal.Rptr. 340, (upon which the court relied, in part, in ruling that California law governs statutes of limitations issues).

**5.** All references to the "earlier lawsuit" are to the lawsuit plaintiff filed against defendants on December 5, 1985 in the District Court for Brazoria County, Texas, Civil Action No. 85G–3335.

sign ideas) and to breach contractual and fiduciary obligations.

Intermedics also presented at trial its claim that all three of the defendants participated in a conspiracy to misappropriate the six design ideas.

Through their motion for summary judgment, defendants assert that the jury's findings compel the conclusion that, before plaintiff filed the instant action on April 23, 1990, the statute of limitations had run in favor of all three defendants on each of plaintiff's theories with respect to each of the six alleged trade secrets.

We divide the discussion in this part of this opinion into three sub-sections. In the first sub-section we analyze the statute of limitations issues as they relate to all the claims (causes of action) *against defendants Pless and Sweeney* that are dependent on alleged misappropriation of the six design ideas that were the subject of the 1992 trial, except the cause of action sounding in civil conspiracy, which we discuss separately as to all three defendants (including Ventritex) in the last subsection, (C.), of this part. In the second sub-section we discuss the statute of limitations issues as they relate to all claims (causes of action) *against defendant Ventritex* that are dependent on alleged misappropriation of the six design ideas, again except the cause of action sounding in civil conspiracy. We address separately in the third subsection the civil conspiracy cause of action against all three defendants, presenting two different bases for granting defendants' motion for summary judgment on this legal theory.

A. *The Statute of Limitations Bar to the Claims (Other than Civil Conspiracy) Against Defendants Pless and Sweeney that Are Dependent on Alleged Misappropriation of the Six Design Ideas*

■ Under California law, the longest applicable statute of limitations for any of the causes of action (with the arguable exception of the conspiracy claim) against defendants Pless and Sweeney is four years, and that is for the breach of contract claim. Cal.Civ.

Proc.Code § 337 (Deering 1991). The statute of limitations for the claims alleging misappropriation of trade secrets and/or confidential information, and for the claims alleging breach of fiduciary duties, is three years. Cal.Civ.Code § 3426.6 (West Supp.1993); Unif. Trade Secrets Act, Prefatory Note, 14 U.L.A. 435 (1990) (noting that one of the principal contributions of the Uniform Trade Secrets Act ("UTSA") is to establish "a single statute of limitations for the various property, quasi-contractual, and *violation of fiduciary relationship* theories of noncontractual liability utilized at common law." (emphasis added)).

The statute of limitations for these kinds of claims begins to run when the cause of action accrues. Because 'misappropriation' (unauthorized disclosure or use) of the design ideas is the essential alleged wrong that gives rise to *each* of plaintiff's different causes of action, we have assumed that the "discovery" rule that California has adopted for fixing the point of accrual of causes of action sounding in misappropriation also applies, in the circumstances of this case, to Intermedics' other state law claims (e.g., breach of contract and breach of fiduciary duty).[6] Since the longest statute of limitations period for any of the claims against Pless and Sweeney (with the arguable exception of the conspiracy claim, which we discuss below in a separate section) is four years for breach of contract, these defendants will be protected by the statute of limitations as against all of plaintiff's state law claims (with the possible exception of conspiracy) if the jury's findings of fact compel the conclusion that plaintiff had discovered or in the exercise of reasonable diligence should have discovered facts which, under plaintiff's view of the case, could have given rise to misappropriation claims with respect to the design ideas in issue more than four years before plaintiff filed the instant action, i.e., more than four years before April 23, 1990.

The jury found that all six of the design ideas that plaintiff claims are its trade secrets or confidential information were in fact disclosed in documents available to William Winstrom, Intermedics' agent, in March

---

**6.** *See Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1258, 1266–67 (1991).

1986, and were in fact available to, or discoverable by, Intermedics and its counsel in the earlier lawsuit that Intermedics dismissed with prejudice on April 10, 1986, a lawsuit in which Intermedics claimed that these same defendants had misappropriated its implantable defibrillator trade secrets by disclosing them to Ventritex. Since, in the jury's view, the same six design ideas that Intermedics claims in this action are its implantable defibrillator trade secrets were disclosed in Ventritex documents that were either shown to or readily discoverable by plaintiff before April 10, 1986, and since it was plaintiff's position in that first suit, and continued to be plaintiff's position in the case at bar, that plaintiff's implantable defibrillator trade secrets made their way to Ventritex via Messrs. Pless and Sweeney, it necessarily follows that before April 10, 1986, plaintiff either had discovered, or, in the exercise of reasonable diligence should have discovered, facts which, in plaintiff's eyes, give rise to the same causes of action for misappropriation, breach of contract and breach of fiduciary duty that plaintiff seeks to pursue in this litigation. Thus, the jury's findings, amply supported by the evidence, compel the conclusion that before April 10, 1986 plaintiff had (literally or constructively) all the information it needed to bring the same state law claims it brings here against Messrs. Pless and Sweeney. Since April 10, 1986 is more than four years before plaintiff filed the instant action it seems to us clear that the statute of limitations bars the misappropriation, breach of contract, and breach of fiduciary duty claims against these two defendants that are based on alleged unauthorized disclosure or use of any of the six design ideas that were the subjects of the 1992 trial.

Despite the compelling character of this straightforward line of reasoning, plaintiff interposes a multitude of strained counterarguments. The argument that plaintiff presses most, from two or three different angles, is, essentially, that the jury's findings show that the statute of limitations could not have begun running in the spring of 1986 because, under those findings, plaintiff could not have established liability on any of the claims that would have been based on the six design ideas. If the design ideas were not secret, the argument runs, plaintiff could not have established a right to relief based on misappropriation or on breach of any contractual or fiduciary duty.

This argument, which at a superficial level seems logical enough, proceeds from a premise that is fundamentally wrong. That premise is that a "cause of action" cannot "accrue" for statute of limitations purposes unless and until it is clear that a plaintiff has, as a matter of historical fact, a winning claim, i.e., until a plaintiff is in a position to present evidence which will (regardless of what evidence the defense musters) establish facts which make liability a legal certainty. This simply is not the law. *See, e.g., Ashton–Tate Corp. v. Ross,* 916 F.2d 516 (9th Cir.1990) and *Whittaker Corp. v. Execuair,* 736 F.2d 1341, 1344–46 (9th Cir.1984) (upholding summary judgment based on lower courts' findings that statute of limitations presented complete bar to claim, without reaching merits of misappropriation claim).

Nor could this be the law without defeating some of the most important purposes of statute of limitations doctrine and turning litigation relationships upside down. As defendants state in their reply, if we were to accept Intermedics' argument, "there would be no statute of limitations for specious or unsupportable claims, only for claims which are ultimately proved to have merit." Defendants' Reply Memorandum and Opposition to Plaintiff's Countermotion, p. 5, filed Mar. 4, 1993 (hereinafter "Defendants' Reply"). Moreover, under plaintiff's theory, a defendant could successfully invoke the statute of limitations only by proving, in trial, that at an earlier time, outside the limitations period, plaintiff would have established liability if it had litigated the matter to judgment. Defendant, in other words, would be required to litigate against herself the plaintiff's stale claim, introducing the evidence that plaintiff would have introduced in the hypothetical earlier litigation, then introducing the evidence that she as defendant would have presented, and then asking the jury to find that she (as defendant) would have lost.

This scenario obviously would impose sociologically impossible strains on parties.

Moreover, it would defeat critical purposes of statute of limitations doctrine. It would make it impossible for defendants to use the statute to avoid the burdens, disruptions, and potential unfairness of going through litigation that should have been commenced much earlier. It also would compel courts to conduct trials on a stale evidentiary base, thus creating considerable risk of unreliable and unjust results.

In a modest variation on the theme just rejected, plaintiff also insists that we cannot find that the statute began running before April of 1986 because no cause of action could have accrued without proof of damages, or of some other judicially cognizable form of injury, and, argues plaintiff, there has not been and could not be a finding that, before April 23, 1986, plaintiff suffered, as a result of acts by defendants, the necessary damages or injury.[7] For the reasons set forth in the preceding paragraph, we decline to hold that a defendant is required to prove that a plaintiff actually suffered cognizable harm in order to invoke the statute of limitations.

We also point out that on plaintiff's theory of the case, plaintiff indisputably had a colorable claim of the requisite level of harm in the spring of 1986. *If* the design ideas truly had been trade secrets, their disclosure to Ventritex, whose only reason for existence was to develop as quickly as possible a product that would compete directly with plaintiff's implantable defibrillator, necessarily would have entailed sufficient harm to support a claim, at least for equitable relief. *See e.g., Whittaker,* 736 F.2d at 1345 (finding that even the old requirement of appreciable harm was satisfied at the time the defendant, a competitor of plaintiff, acquired plaintiff's alleged trade secrets). A trade secret, by definition, has value. Its value, again by definition, derives from competitors not knowing it. One of the principal forms of value in trade secrets of the kind in issue here, as Intermedics has contended for years, revolves around the notion of a commercial "head start".[8] The holder of a genuine trade secret enjoys a head start that it would lose if a competitor learned its secret. It follows that *if* any of the six design ideas in issue had been trade secrets in 1985–86, they would have had value that would have been reduced by disclosure to a competitor. That is a kind of harm that clearly would have been sufficient to support judicial relief, as plaintiff argued vigorously in the 1985 litigation. *See, e.g., Hyde v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 778–79 (1958) (where the Texas Supreme Court affirmed the granting of an injunction to prevent a

---

**7.** Plaintiff cites the Ninth Circuit case, *Whittaker Corp. v. Execuair Corp.,* and the California Supreme Court case, *Davies v. Krasna,* for the proposition that "there must be actual and appreciable harm, not mere nominal damages, for a cause of action to accrue." 736 F.2d 1341, 1346 (9th Cir.1984) (citing *Davies v. Krasna,* 14 Cal.3d 502, 514, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975)).

Although *Whittaker* and *Davies* required plaintiff to have suffered appreciable and actual harm for a cause of action to accrue for misappropriation of trade secrets and breach of confidence (respectively), we believe that when California adopted the UTSA, it implicitly rejected the *Whittaker/Davies* "appreciable harm" requirement in a misappropriation of trade secrets case. The language of the UTSA makes no reference to an "appreciable harm" requirement. The UTSA clearly states that the statute of limitations begins to run when "the misappropriation" is discovered or reasonably should have been discovered. Cal.Civ.Code § 3426.6 (West Supp.1993). And misappropriation, under the Code, can consist simply of unauthorized *disclosure* of a trade secret by a person under a duty to preserve its confidentiality. Cal.Civ.Code § 3426:-

1(b)(2)(B)(ii). Thus, the drafters of the UTSA seem to have accepted the proposition that mere disclosure, at least if by a person under a duty to maintain the secrecy of the information (as Pless and Sweeney clearly were here) is actionable as misappropriation, i.e., gives rise to access to judicial relief. This is consistent with our view, expressed in the text, that there is, as a matter of law, sufficient harm or threat of harm in disclosure of a real trade secret to a competitor for a cause of action to accrue.

**8.** *See, e.g.,* Plaintiff's Original Petition and Application for Temporary Injunction, ¶¶ 6 and 8, filed Dec. 5, 1985 in the Texas district court sitting in Brazoria, Texas, Civil Action No. 85G–3335. In the complaint filed by Intermedics in the 1985 action, Intermedics alleged that "Ventritex's objective is to market this device in a fraction of the time and without spending large sums of research and development monies by usurping other company's trade secrets." and complained that "Intermedics' competitive advantage would be forever lost" if the court did not stop defendants from misappropriating Intermedics' implantable defibrillator trade secrets and confidential information.

person who had gained knowledge of trade secrets in confidence from exploiting the economic advantage or "head start" gained thereby, even after the issuance of a patent had made the trade secrets public knowledge).

We also reject Intermedics' apparently frivolous argument that the statute of limitations has not run because misappropriation of trade secrets is a continuing tort. As we ruled earlier in this action, under California's choice of law principles we must apply California statute of limitations law in the circumstances of this case. California's statute of limitations for claims based on alleged misappropriation of trade secrets is set forth in Civil Code section 3426.6, which adopts an identical provision of the UTSA. Section 3426.6 expressly rejects the continuing tort theory, stating: "For the purposes of this section, a continuing misappropriation constitutes a single claim." Cal.Civ.Code § 3426.6 (West Supp.1993); see also Ashton–Tate Corp. v. Ross, 916 F.2d 516 (9th Cir.1990). In the comments to this section of the UTSA the drafters make the point even more clearly: "This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights." Unif. Trade Secrets Act § 6, Comment, 14 U.L.A. 462 (1990). Moreover, even before the California legislature adopted the UTSA, the state's courts had rejected the continuing tort theory for claims based on misappropriation of trade secrets. See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288 (9th Cir.1969) and Whittaker Corp. v. Execuair Corp., 736 F.2d 1341 (9th Cir.1984).

■ Intermedics attempts to avoid this result by insisting that the law of Texas, rather than California, should determine whether to treat trade secret claims as "continuing wrongs." While we have ruled, earlier in this case, that California's choice of law rules require us to use Texas' substantive law[9] in adjudicating, the merits of plaintiff's trade secret claims, and thus to determine whether plaintiff had protectable interests in its design ideas and, if so, whether defendants committed acts of misappropriation, it does not follow that we should resolve the issues of whether misappropriation is a continuing wrong by applying Texas law. The only context in the case at bar in which the notion of a "continuing wrong" has any play is in resolving the statute of limitations issue. Because we have ruled that California law must govern disposition of statute of limitations issues, we would contradict our own choice of law holdings if we were to look to Texas law to resolve this question. And if Texas law resolved the issue differently than it would be resolved under California principles, we would frustrate the purposes of California choice of law doctrine if we were to follow Texas law.

It may be worth noting, however, that we would reject plaintiff's argument even if we were inclined to look to Texas law on this point. We believe that Texas courts also would reject the continuing wrong theory. Intermedics argues that "[b]ecause the continuing tort doctrine is logically connected with § 757, Restatement of Torts, it is more likely than not that Texas courts would apply the continuing tort doctrine in determining when an action for trade secret misappropriation accrues." Plaintiff's Memorandum in Opposition to Defendants' Motion for Entry of Summary Judgment, filed Feb. 24, 1993, p. 14 (hereinafter "Plaintiff's Opposition"). We find this argument unpersuasive.

Whether a jurisdiction accepts or rejects the continuing tort theory has more to do with whether the jurisdiction views the principal interest protected by its trade secret law as "property" or as "confidential relationships" than with whether the jurisdiction follows the Restatement of Torts. Cf. Monolith, 407 F.2d 288 with Underwater Storage, Inc. v. United States Rubber Co., 371 F.2d 950 (D.C.Cir.1966), cert. den., 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967). Moreover, contrary to plaintiff's suggestions, we

---

9. Texas has not adopted the UTSA. Instead, when resolving liability issues in trade secret cases, Texas courts apply Section 757 of the First Restatement of Torts.

believe that jurisdictions which apply section 757 of the First Restatement are likely to reject the continuing tort doctrine. This follows because the Restatement clearly rejects the notion that the interest protected by trade secret law is some species of "property". Instead, Comment a. to section 757 explicitly declares: "The suggestion that one has a right to exclude others from the use of his trade secret because he has a *right of property* in the idea has been frequently advanced and *rejected.* The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret." Restatement (First) of Torts § 757, comment a. (emphasis added).

It also is significant that plaintiff has not been able to cite a single opinion from a Texas court that adopts the continuing tort theory in a misappropriation of trade secrets case. And while no Texas court has so explicitly rejected the theory that we can say there is absolutely no room to raise the question, there is implicit support for our inference that Texas has rejected the continuing wrong position in at least three reported Texas cases. In *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service,* the Supreme Court of Texas appeared to reject the "property" theory of protection of trade secrets when it stated that "[t]he basis of the trade secret case is a 'breach of contract or wrongful disregard of confidential relationships.'" 158 Tex. 594, 314 S.W.2d 782, 787 (1958) (citations omitted). On the same day, the same Texas court decided *Hyde v. Huffines,* declaring that the gravamen of a trade secret misappropriation claim is a "breach of confidence." 158 Tex. 566, 314 S.W.2d 763, 771 (1958). Finally, in *J.C. Kinley Co. v. Haynie Wire Line Service, Inc.,* a Texas appellate court affirmed the trial court's holding that "appellants' cause of action is barred by the applicable statute of

limitations, as suit was not brought within two years of the occurrence of the *first* breach." 705 S.W.2d 193, 198 (Tex.App.1985) (citation omitted) (emphasis added).

Thus, even if Texas law were applicable, which it is not, plaintiff could not avoid the bar of the statute of limitations on the trade secret claims by invoking the continuing wrong doctrine.

■ Intermedics next insists that even if we reject the continuing tort theory in connection with its trade secret claims, we should adopt the functional equivalent of that theory in connection with Intermedics' breach of contract claims. Intermedics makes this argument even though, under its theory of the case, if there were any breaches of contract they would consist entirely of the same acts of misappropriation of trade secrets or confidential information that would be barred by the statute of limitations applicable to trade secret claims. Undaunted by the fact that permitting these same claims to go to trial under a contract theory would frustrate the legislature's judgment about how the statute of limitations should operate for trade secret cases, Intermedics insists that we treat *each* act of unauthorized disclosure or use of a trade secret or business confidence, i.e., each act that allegedly constitutes a breach of contract by Pless or Sweeney, as a separate wrong that gives rise to a *separate breach of contract cause of action* for purposes of the statute of limitations. Intermedics has failed to provide the court with any precedential or persuasive authority for applying this continuing wrong doctrine to its breach of contract claims.

One of the opinions on which plaintiff seems to rely most is *Computer Data Systems, Inc. v. Kleinberg,* 759 F.Supp. 10 (D.D.C.1990).[10] Intermedics claims that the *Computer Data Systems* court "addressed this issue squarely." Plaintiff's Opposition, p. 15. As we read this opinion, however, it has nothing to do with trade secrets, much

---

**10.** Intermedics also cites *General Precision, Inc. v. Ametek, Inc.,* 20 N.Y.2d 898, 285 N.Y.S.2d 867, 232 N.E.2d 862 (1967), *aff'g* 26 A.D.2d 909, 274 N.Y.S.2d 340 (1966). This opinion represents questionable authority for the case at bar, however, because New York courts accept the continu-

ing tort theory for claims of trade secret misappropriation. *See, e.g., Kistler Instrumente A.G. v. PCB Piezotronics, Inc.,* 419 F.Supp. 120 (W.D.N.Y.1976). As pointed out in the text, California has explicitly rejected the continuing tort theory in trade secret cases.

less a contractual agreement not to disclose trade secrets.

In *Computer Data Systems* defendants brought a counterclaim alleging that plaintiff breached a licensing agreement by attempting to reduce its royalty obligations by selling software programs in packages instead of separately. *Computer Data Systems*, 759 F.Supp. at 17. The district court faced the question of whether, for purposes of the statute of limitations, it should treat each sale of the programs separately or whether it should treat all the sales as one ongoing wrong. *Id.* Focusing on the nature of the obligations created by the kind of contract in issue, the court noted that each sale of a program covered by the contract created a severable royalty obligation, and that each such obligation became due within thirty days of the end of the calendar quarter in which the sale was made. Thus, counter-claimant suffered a separate harm each time a royalty was underpaid. The court held that "each allegedly wrongful sale constitute[d] a unique transaction or occurrence which [stood] on its own for statutory limitations purposes." *Id.*

Plaintiff contends that its breach of contract claims in this case are analogous to the claims made in *Computer Data Systems*. Somewhat more specifically, Intermedics claims that each of its trade secrets is valuable and that Intermedics suffered a distinct harm each time Pless or Sweeney disclosed or used any one of its trade secrets or any item of its confidential information. It follows, according to Intermedics, that "each wrongful disclosure of a trade secret gives rise to a new cause of action for breach of contract against Pless and Sweeney for statutory limitations purposes." Intermedics' Opposition, p. 16.

The difficulty with Intermedics' argument is that it fails to take into account the material differences between the case at bar and *Computer Data Systems* with respect to both the kinds of contracts involved and the kinds of interests the contracts sought to protect. The contract involved in *Computer Data Systems* explicitly created an independent payment obligation each time a sale was made. Thus, the licensee might well have honored the terms of the contract with respect to 19 of the first 20 sales, and with respect to all sales after the twentieth, but have breached with respect to that twentieth sale. That one breach would give rise, foreseeably, to a cause of action only for the harm caused by the one breach, a harm that the parties understood would be readily separable and measurable in a straightforward mathematical calculation. Thus, the contract in *Computer Data Systems* created a series of separable obligations, each of which stood on its own terms, and the content of each of which was known in advance to both parties.

In the case at bar, in sharp contrast, what the contracts created was not a tidy series of separate payment obligations, but a confidential relationship, a duty to care in good faith for plaintiff's proprietary interests. Those interests covered a wide spectrum of matters (from operational plans to anticipated market moves to technical information and scientific know how) and, importantly, were never systematically identified by plaintiff for defendant. Rather, as its witnesses testified at trial, Intermedics believed that defendants were in a better position than plaintiff to know what technical matter qualified as Intermedics' confidential information, so Intermedics was compelled to rely on defendants' general obligation to protect in good faith Intermedics' unspecified and unidentified interests. Since these interests covered such a wide range of matters, and since, as the evidence in the 1992 trial showed, many of the technical trade secrets were closely related and reached overlapping material, it would have been impossible in advance either to isolate separate breaches or to foresee and calculate the economic harm each such breach might entail. Thus, the obligations imposed by the contracts were, of necessity, abstract and devoid of specifics. That fact reinforces the conclusion that fundamentally the contracts in our case had to be about relationships, loyalty, and good faith. These are unitary rather than readily divisible kinds of interests, and it was foreseeable that any breach of these obligations would jeopardize all the disparate and undefined matter the obligations reached. Given these realities, we cannot hold that the contracts in issue in our case created a series of discrete,

severable obligations as to which separate breaches could be readily identified. Without such severability, the parties could not reasonably have expected each act that arguably could be separated from others to give rise to a separate cause of action and a new period of limitations.

Moreover, we agree with defendants that it would be "anomalous" to reject the continuing tort doctrine for purposes of Intermedics' claims of misappropriation of trade secrets or confidential information, but to accept an analogous "continuing breach" doctrine for purposes of the breach of contract claims that are based on the same alleged misappropriations. We emphasize again that California authorities, legislative and judicial, have insisted that the basis for liability under trade secret causes of action is breach of a confidential relationship. Faced with the issue pressed here by plaintiff, we believe that California courts would perceive no principled basis for treating differently, with respect to the statute of limitations, a confidential relationship that is implied by law and one that is created by a written instrument. *See* R. Milgrim, Milgrim on Trade Secrets, § 7.04[2], p. 7–61 (1992) (Discussing the time of the wrong for purposes of the statute of limitations without distinguishing between whether "a party is bound by contract or law to neither use nor disclose certain trade secrets[.]").

B.   *The Statute of Limitations Bar to the Claims (Other than Civil Conspiracy) Against Defendant Ventritex that Are Dependent on Alleged Misappropriation of the Six Design Ideas*

■ Intermedics claims, with respect to the six design ideas that were the subjects of the 1992 trial, that defendant Ventritex misappropriated its trade secrets, violated California's unfair competition statute,[11] induced defendants Pless and Sweeney to misappropriate trade secrets or confidential informa-

tion and in so doing to breach contractual and fiduciary obligations. Intermedics also claims that all the defendants participated in a conspiracy to misappropriate trade secrets.

For defendant Ventritex, the longest arguably applicable statute of limitations (with the possible exception of the conspiracy claim, which we discuss separately in the next section) is the four years for the unfair competition claim. Under California law, the claims that Ventritex induced Pless and Sweeney to breach their fiduciary duties and contractual obligations are governed by California Civil Procedure Code section 339, which establishes a two year statute of limitations for "an action upon a contract, obligation or liability not founded upon an instrument in writing. . . ." Cal.Civ.Proc. Code § 339, subd. 1 (Deering 1991). The claim for misappropriation is governed by the three year statute of limitations in Civil Code section 3426.6. Cal.Civ.Code § 3426.6 (West Supp.1993).

Because the unfair competition claim and the inducement claims are based on the misappropriations that are the subject of the trade secret claims, we have given Intermedics, with respect to these other state law causes of action, the benefit of the "discovery" rule that the California legislature has made part of the statute of limitations for misappropriation claims. Our rulings assume, in other words, that the statute of limitations on the inducement and the unfair competition claims does not begin to run until plaintiff discovered or in the exercise of reasonable diligence should have discovered facts which, under plaintiff's view of the case, could have given rise to the inducement or unfair competition claims.[12]

Under these assumptions, the longest statute of limitations period for any of plaintiff's claims against Ventritex is four years for unfair competition, and that period would commence when Intermedics discovered or should have discovered the facts that could

11.   California's unfair competition statute is set forth in California Business and Professions Code section 17200 et seq. The statute of limitations for the unfair competition claim is set forth in section 17208, which states, "Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years

after the cause of action accrued." Cal.Bus. & Prof. Code § 17208 (Deering 1992).

12.   *See Mathis v. Hydro Air Industries, Inc.*, No. CV 80–1389 MRP, CV 80–4481 MRP, CV 81–1631, slip op. (C.D.Cal. Aug. 8, 1983).

support its misappropriation claim. Thus, Ventritex is protected by the statute of limitations against the non-conspiracy claims if it is clear, under the jury's findings of fact, that Intermedics had discovered, or in the exercise of reasonable diligence should have discovered, facts which could have supported plaintiff's misappropriation claims against Ventritex with respect to the six design ideas more than four years before Intermedics filed the instant action.

Under *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341 (9th Cir.1984), the statute of limitations principles that apply in a misappropriation action against a party who allegedly breached directly a confidential relationship also apply in a misappropriation action against a third party, like Ventritex, who never had a confidential or contractual relationship with plaintiff. In *Whittaker,* the Ninth Circuit addressed the question of "when a cause of action for misappropriation by a third party of material communicated in confidence between two other parties arises under California law." 736 F.2d at 1345. Citing *Monolith* and *Davies,* the *Whittaker* court held that the cause of action against a third party for misappropriation of trade secrets accrued when the plaintiff "became aware that [defendant] acquired the drawings alleged to be trade secrets."[13] *Id.* The Ninth Circuit stated that, for accrual purposes, there was no reason to distinguish between wrongful acquisition of a trade secret by a third party who does not have a confidential relationship with plaintiff and wrongful disclosure of a trade secret by a party who stands in a confidential relationship with plaintiff. *Id.*

Because *Whittaker* directs us to treat defendant Ventritex the same way we have treated defendants Pless and Sweeney for purposes of the statute of limitations, the reasoning set forth in the paragraphs above compels us to conclude, except with respect to the conspiracy claim, which we discuss separately, that the statute of limitations bars all of the claims that plaintiff seeks to assert against Ventritex based on any of the six trade secrets that were the subject of the 1992 trial.

## C. The Conspiracy Claims That Are Related to the Six Design Ideas that Were the Subject of the 1992 Trial

For reasons elaborated below and in the next part of this opinion, we discuss separately the fate of plaintiff's allegations that all three defendants participated in a civil conspiracy to misappropriate its trade secrets.

There is a straightforward basis for entering judgment on this cause of action with respect to the six design ideas that were the subject of the 1992 trial. Since the jury found that none of the six design ideas constituted a trade secret or confidential information at the time defendants Pless and Sweeney stopped working for Intermedics, and since the necessary essence of the allegedly unlawful object of the conspiracies as pled by plaintiff is unauthorized disclosure and/or use of trade secrets or confidential information, the jury's findings eliminate the possibility that plaintiff could prove a necessary element of the conspiracy claims with respect to the six design ideas that were the subject of the 1992 trial.[14] It follows that

13. The Ninth Circuit decided *Whittaker* before California adopted the UTSA. *See* Cal.Civ.Code § 3426 et seq. (West Supp.1993). Section 3426.6 of that act states: "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim." Cal.Civ.Code § 3426.6 (West Supp.1993). We believe that the addition of this "discovery" element modifies the holding in *Whittaker* to the extent that an action for misappropriation would accrue *either* when a plaintiff discovers that a third party acquired plaintiff's trade secrets *or* when plaintiff "by the exercise of

reasonable diligence should have ... discovered" the alleged misappropriation, whichever occurred earlier.

14. *See, e.g., Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983) (Stating that, under Texas law, the essential elements of a civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds; (4) one or more *unlawful,* overt acts; and (5) damages as the proximate result.") (emphasis added) and *Kelly v. Diocese of Corpus Christi,* 832 S.W.2d 88, 95 (Tex.App.1992) (Stating, "An actionable conspiracy must consist of wrongs that would have been actionable against the conspirators individually."). Earlier in these

defendants are entitled to judgment as a matter of law on the conspiracy claims.

As a separate, independent basis for granting defendants' motion, we also hold that the statute of limitations would bar plaintiff's pursuit of the conspiracy claims with respect to these six design ideas even if they had been 'secret' when Pless and Sweeney left plaintiff's employ.

We are constrained to discuss separately the statute of limitations issues raised by the conspiracy allegations because, under California law, the statute of limitations on civil conspiracy claims generally is said not to begin running until completion of the last overt act committed in furtherance of the conspiratorial goal. *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 786–789, 157 Cal. Rptr. 392, 598 P.2d 45 (1979). Since plaintiff asserts that the object of the alleged conspiracy was to misappropriate trade secrets or confidential information, and since the limitations period for conspiracy claims is fixed by reference to the limitations period for the kind of wrong that is alleged to be the object of the conspiracy, *Maheu v. CBS, Inc.,* 201 Cal.App.3d 662, 673, 247 Cal.Rptr. 304 (1988), it would appear that plaintiff would not be barred from pursuing this conspiracy claim by the statute of limitations unless it filed this suit more than three years after it discovered or should have discovered the commission by one or more of the defendants of the last overt act in furtherance of the goal of misappropriating the six design ideas.[15]

The jury's findings compel the conclusion, with respect to the six alleged trade secrets in issue here, that before April 23, 1986, Intermedics discovered, or in the exercise of reasonable diligence should have discovered, that acts that would constitute misappropriation, under plaintiff's theory, had been committed by the defendants. Since plaintiff had alleged in the original 1985 lawsuit that these same defendants had formed a conspiracy whose purpose was to misappropriate alleged implantable defibrillator confidences, plaintiff's discovery of the acts that would constitute the misappropriation would trigger the statute of limitations (and bar the present claims) but for the theory that the statute does not begin running until commission of the last overt act in furtherance of the alleged conspiracy.

Plaintiff contends, not surprisingly, that defendants committed additional acts of misappropriation of the six design ideas well after April 23, 1986, and that plaintiff neither knew nor could have known about these subsequent wrongful acts until well into the period that is immune from attack under the statute of limitations. We hold, however, that even if true, these contentions cannot insulate plaintiff from the bar of the statute of limitations.

The principal rationale for this holding has two related components. The first of these components is that under the jury's findings plaintiff knew or should have known, at the time it dismissed the first suit, that the *goal* of the alleged conspiracy already had been *largely achieved,* certainly with respect to

---

proceedings, the court determined that although California law applied to the statute of limitations with respect to the conspiracy claim, Texas law applied to the substance of the conspiracy claim. *See supra* note 4.

**15.** In the case at bar, the object of the alleged conspiracy was to misappropriate trade secrets or confidential information. As indicated in the text, the limitations period for misappropriation claims under California law is three years from the date the misappropriation was discovered or by the exercise of reasonable diligence should have been discovered. Cal.Civ.Code § 3426.6.

Plaintiff also has pled a conspiracy to breach contractual and fiduciary obligations. Assuming that Texas courts would recognize a cause of action for conspiracy to induce a breach of con-

tract or to breach fiduciary duties against a party to the contract, the statute of limitations for a conspiracy claim alleging this theoretically separate object would be two years under California Civil Procedure Code section 339, subd. 1. *See* 15A C.J.S. *Conspiracy* § 13 (1967 and supp. 1992) (comparing the conflict between jurisdictions that accept and those that reject the notion "that an action for conspiracy to induce a breach of contract may be maintained against a party to the contract who is included among the conspirators ..."). Although our research has found no current Texas case that directly addresses this issue, our reading of *Snodgrass v. American Surety Co. of New York,* 156 S.W.2d 1004 (Tex.Civ. App.1941), suggests that Texas courts probably would recognize a claim based on an alleged conspiracy to induce a breach of contract or breach of fiduciary duties.

the six design ideas that were the subject of the 1992 trial. This follows in part because, for purposes of California statute of limitations law, misappropriation is not a continuing wrong, meaning, among other things, that the essence of the cause of action is fully mature (the essence of the actionable wrong has been committed) when the *first* real breach occurs in the confidential/fiduciary relationship that gives rise to the duty to protect trade secrets. This view of the essence of the tort of misappropriation makes particularly good sense in cases like ours, where *much of the value of an alleged trade secret is lost,* by plaintiff's hypothesis, as soon as a serious competitor simply *knows* about the secret. Much of the value of the secret, in other words, inheres in the idea itself, and the competitive head start that having the idea provides a plaintiff. Under the jury's findings, *plaintiff knew* or readily could have discovered, *before* it dismissed with prejudice the first suit on April 10, 1986, that *Ventritex in fact had learned (apparently through Pless and Sweeney) the design ideas* that plaintiff contends in the instant action were its trade secrets.

The second component of the reasoning that supports our holding that the statute bars plaintiff's conspiracy claims consists of the proposition that once the object of a conspiracy to *misappropriate* has been essentially achieved, it would strain even civil conspiracy reasoning beyond the breaking point to hold that acts of misappropriation that are repeated or committed after the goal of the conspiracy has been largely achieved sensibly can be characterized as acts "in furtherance" of the original conspiracy. While there is no California authority squarely on point here, there are reported decisions by California courts (discussed below) that recognize that it makes little sense to say that acts committed *after* the goal of a conspiracy has been achieved were committed "in furtherance" of that conspiracy.

■ California courts have recognized that to determine whether an act is committed in furtherance of a conspiracy, a court first must define the nature and scope of the particular conspiracy. *Livett v. F.C. Financial Assoc.,* 124 Cal.App.3d 413, 418–21, 177 Cal.Rptr. 411 (4th Dist.1981). For assistance in defining the nature and scope of a conspiracy, the *Livett* court turned to *People v. Zamora,* 18 Cal.3d 538, 134 Cal.Rptr. 784, 557 P.2d 75 (1976), a California Supreme Court opinion dealing with a criminal conspiracy. As the *Livett* court pointed out, the reasoning in *Zamora* also is applicable to a civil conspiracy. *Livett,* 124 Cal.App.3d at 419, 177 Cal.Rptr. 411 (citing *Wyatt,* 24 Cal.3d at 787, 157 Cal.Rptr. 392, 598 P.2d 45).

In *Zamora,* the court first "required an identification of the 'substantive offense which is the primary object of the conspiracy.'" *Id.* (citing *Zamora,* 18 Cal.3d at 560, 134 Cal.Rptr. 784, 557 P.2d 75). The *Zamora* court concluded,

[A]cts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy. Consequently, upon successful attainment of the substantive offense which is the primary object of the conspiracy, the period of the statute of limitations for the conspiracy begins to run at the same time as for the substantive offense itself. Our holding ... simply means that *for purposes of the statute of limitations* an overt act in furtherance of the conspiracy cannot be committed subsequent to the completion of the object which made the conspiracy unlawful in the first instance.

18 Cal.3d at 560, 134 Cal.Rptr. 784, 557 P.2d 75 (emphasis in original) (citations and footnotes omitted).

While the *Zamora* court pointed out that its holding would not apply when a claim involved something that the law would deem "*truly* a 'continuing conspiracy'," (*Id.* at 538, n. 21, 134 Cal.Rptr. 784, 557 P.2d 75, emphasis in original), the *Zamora* reasoning seems especially compelling in a case like the one at bar, where the law has explicitly *rejected* the suggestion that the tort that allegedly constituted the object of the conspiracy, misappropriation of trade secrets,[16] should be deemed

16. For a conspiracy among all three defendants

to be actionable under Texas law, the conspiracy

a "continuing" wrong. It is of considerable significance that under California law, for purposes of the statute of limitations, the *wrong* in issue here *has been committed* when the *first act of misappropriation* occurs, i.e., when a defendant commits the first act in breach of his duty of confidentiality, and that subsequent additional acts of misappropriation are not deemed new "wrongs" that give rise to new limitations periods, but are of significance only in calculating damages.

Thus, we hold that the wrong that plaintiff alleges was the essential object of the conspiracy had been committed, if at all, before April 10, 1986, and that, under the jury's findings, by that date plaintiff had discovered, or should have discovered, the facts that it now contends constitute that wrong. We further hold that any subsequent additional acts of misappropriation of the trade secrets cannot be considered "in furtherance" of the alleged conspiracy and therefore are irrelevant to fixing the point where the statute of limitations on this conspiracy claim began running. It follows that all three defendants are entitled to judgment, as a matter of law,

would have to have been formed before July 1985, when Pless and Sweeney became employees of Ventritex. *See Wilhite v. H.E. Butt Co.*, 812 S.W.2d 1, 5 (Tex.App.1991) ("As a matter of law, a corporation or other company cannot conspire with itself, no matter how many of its agents participate in the complained-of action."). Thus, Intermedics cannot assert, under the law, a claim that the defendants formed a conspiracy to *conceal* any alleged acts of misappropriation *after* Pless and Sweeney joined Ventritex.

**17.** The opinions that come closest to being on point are *Monolith Portland Midwest Company v. Kaiser Aluminum & Chemical Corporation*, 407 F.2d 288 (9th Cir.1969), *Avco Corporation v. Precision Air Parts, Inc.*, 676 F.2d 494 (11th Cir. 1982), and *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.*, 1986 WL 9876, 230 U.S.P.Q. 300 (E.D.Mich.1986).

*Monolith* does not dictate the outcome here because it involved alleged repeated use of only one trade secret.

While the circumstances and issues in *Avco* appear to be much more similar (in material respects) to the case at bar, e.g., that litigation apparently involved misappropriations at different times of arguably different trade secrets (see two other published opinions in the same litigation: *Precision Air Parts, Inc. v. Avco Corporation*, 736 F.2d 1499 (11th Cir.1984), and *Avco*

that they are protected by the statute of limitations from any claim sounding in civil conspiracy related to the six alleged trade secrets that were the subjects of the 1992 trial.

## IV. THE STATUTE OF LIMITATIONS ALSO BARS PROSECUTION OF CLAIMS ARISING OUT OF MISAPPROPRIATION OF PLAINTIFF'S *OTHER* ALLEGED TRADE SECRETS OR CONFIDENTIAL INFORMATION

To our knowledge, no court has squarely addressed the issue we confront here: under California law, when a cause of action accrues against given defendants for misappropriation of some of plaintiff's alleged trade secrets or confidential information, does the statute of limitations also begin to run from that same time against those same defendants with respect to misappropriations of *other* alleged trade secrets or confidential information of plaintiff's, even misappropriations that might not occur until a later period? Since there is no controlling authority squarely on point,[17] we must analyze the

*Corporation v. Precision Air Parts, Inc.*, 210 U.S.P.Q. 894 (M.D.Ala.1980)), *Avco* is based on Alabama law, is from a geographically more distant federal court of appeals, and does not delineate the factual setting with sufficient clarity to permit full confidence about the reach of its holding.

*Pilkington* is a decision by a federal district court in Michigan, applying Michigan and federal common law, not the UTSA. Moreover, the district judge in that case assumed that for purposes of statute of limitations analysis, trade secrets were deemed a species of 'property', whereas both California and Texas law have elected to view the interests that trade secret law protects not as property but as confidential relationships. We also note that there were a great many separate factual bases for the ruling by the *Pilkington* court and that the district judge did not even squarely acknowledge the existence of the issue we confront in the text.

Having said all that, we believe that there is indirect support in *Pilkington* for the result we reach, in part because the district judge in that case seemed to believe that because the plaintiff's trade secrets were so closely related (it appears that all the alleged secrets were to be used in connection with one manufacturing process), notice to plaintiff that defendant likely was using some of its secrets imposed on plaintiff a duty to determine whether defendant was using other,

cases that seem most closely analogous, looking for underlying principles or theories that could guide us to a reliable judgment about how California courts would answer this question. We also must consider the implications (in circumstances like those presented by this case) of each solution option for the policies and interests that California authorities (legislative and judicial) balance and seek to protect through the law of statutes of limitations. As noted at the outset, we do not purport to offer an answer to this question that would necessarily be appropriate in all cases and circumstances; instead, we answer the question in the specific circumstances of the case at bar, acknowledging the possibility that we (and other courts applying California law) might come to a different conclusion in a dissimilar factual setting.

To reason reliably about this matter, we must begin by reemphasizing that we are applying the law of a jurisdiction that has squarely rejected the theory that misappropriation of trade secrets is a species of "continuing wrong." This rejection, first visible in judicial pronouncements, then unequivocally repeated by the California legislature when it enacted its version of the UTSA,[18] has been understood as deriving necessarily from the clear choice made by California authorities about the fundamental character of the underlying interest that California trade secret law is intended to protect. Building from insights and analytical choices suggested generations ago by Justice Oliver Wendell Holmes, Jr., California authorities have rejected the theory that trade secrets should be treated as forms of "property" and have refused to permit notions imported from the law of property to drive development of trade secret statute of limitations doctrine. Instead, California authorities have insisted that the focus of trade secret law be on the relationship of trust and confidence between a party who holds a trade secret and the parties with whom that secret was shared. This emphasis is clear in *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288 (9th Cir.1969), where the Court of Appeals for the Ninth Circuit quoted from Justice Holmes' opinion in *E.I. Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917) en route to concluding that what California trade secret law protects is "the relationship between the parties at the time the secret is disclosed" and, most significantly for our purposes, that the "fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated." *Id.* at 293.

Thus, the fundamental purpose of California trade secret law is to encourage the honoring of confidences shared in such relationships, i.e., to encourage the preservation of the relationships and the protection of the confidences, and to provide parties who are victimized by breaches of those relationships with a remedy.

It also is significant, for our purposes, that the decision to ground trade secret doctrine in concern about relationships, rather than in concepts of property law, appears to be not the product of analytical whim but of a fundamental policy choice about how best to balance tensions inherent in trade secret law generally. At the most fundamental level, this tension is between society's interest in promoting development of economically pro-

---

related trade secrets. *See, e.g.,* paragraph numbered 26, where, discussing what was disclosed in defendant's annual report, the district judge stated: "Although certainly not all of the alleged trade secrets were visible in the photos, and although some of those that were were not visible in full, the Court finds that enough of the trade secrets were visible so that Pilkington actually knew *some* of its trade secrets and technology were being used and reasonably should have known that *others* were." 230 U.S.P.Q. at 303 (emphasis added). We cannot tell from the *Pilkington* opinion, however, whether the district court would have held that when the statute began running as to some of the related trade secrets (because plaintiff knew or should have known about defendant's alleged misappropriation of them) it also began running as to those other (related) trade secrets that defendant might well not have begun using until a later period.

18. The relevant statute of limitations is section 3426.6 of the California Civil Code, which declares that: "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, *a continuing misappropriation constitutes a single claim.*" (emphasis added).

ductive new ideas by providing access to rewards (profits) to those who generate and implement such ideas, on the one hand, and, on the other, society's interest in not imposing development-retarding, monopolistic, or arbitrary constraints on use of identical ideas by persons who come to them free of the taint of stealing. Thus, the decision to focus on relationships and not to treat trade secrets as "property" apparently reflects a policy choice by California authorities in which interests in promoting freer use of new ideas was elevated at least to some extent over interests in rewarding holders of economically significant secrets.

Because they refuse to ground trade secret doctrine in concepts of property law, California authorities are much less likely to resolve issues arising in this subject area by focusing on the location or fate of information that could be characterized as separate trade secrets than by focusing on the condition or state of the relationship between the holder of the information and the persons to whom the holder imparted it. As *Monolith* and *Ashton–Tate* make clear, the courts' central concern when analyzing statute of limitations questions with respect to alleged misappropriations of trade secrets is with identifying the point at which the *first* apparent breach of the confidential relationship occurred, or when plaintiff knew or should have known about that first breach. Just as they refuse to hold that each subsequent act of misappropriation of a single trade secret gives rise to a new claim for purposes of the statute of limitations, we believe that California courts, concerned primarily with first breaches of relationships, are not likely to hold, at least absent some unusual and compelling consideration in a given set of facts, that a plaintiff acquires a new cause of action every time a defendant commits an act of misappropriation with respect to a piece of information that is characterizable as a separate trade secret, even though the defendant had only one relationship with the plaintiff and even though the defendant learned all the alleged-

ly secret information through that one relationship.

One of the important underpinnings of this inference is our perception that there is no meaningful difference (in either logic or implications for real world interests) in statute of limitations principle between the following two scenarios.

In the first scenario, the defendant first breaches a duty of confidence by misappropriating a given trade secret in a way that apparently would cause relatively little economic harm (e.g., through disclosure to a third party who at the time is very weak economically and who might use the secret only in an insignificant product), thus giving the plaintiff little real economic incentive to sue, but later that same defendant misappropriates that same trade secret again, this second time in a way that obviously would cause huge economic harm to plaintiff (e.g., by helping the same third party, who by now has become very healthy economically and looms as plaintiff's principal competitor, use the same trade secret in a different product, a product that threatens to drive plaintiff's principal product out of the market).

As we understand the relevant California law, the statute of limitations in this first scenario would begin to run as soon as plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the *first* misappropriation of the one trade secret in issue, even though that first misappropriation was relatively inconsequential and, by itself, would not appear to justify the cost of suing, and even though the second, later misappropriation was a separate act, was committed in relation to a different product, was a thousand fold more damaging, and was the only act of misappropriation that obviously and directly justified instituting litigation. Under California law, the statute of limitations would bar a lawsuit first filed shortly after the second misappropriation if plaintiff had discovered, or should have discovered, the first misappropriation more than three years earlier.[19]

19. When they crafted the statute of limitations provision of the UTSA the drafters apparently were aware that rejection of the continuing wrong approach could lead to arguably harsh results in some circumstances. One way the drafters sought to soften such impacts was by also rejecting the notion, apparently accepted in *Monolith,* that the statute of limitations began to

The second scenario involves misappropriations by one defendant of two arguably different trade secrets, both of which he learned from plaintiff during the same time period and as a result of the same confidential employment relationship. In this scenario, defendant's first breach of the duty of confidence involves disclosure of trade secret "x" to a competitor of plaintiff's. Plaintiff knows about the disclosure, but elects not to sue, not perceiving this particular breach of the duty as likely to cause enough real economic harm to plaintiff to justify litigation. Some time later, the same defendant breaches the same duty of confidence by disclosing an arguably different trade secret (secret "y") to the same competitor. Perceiving the disclosure of this second secret ("y") as posing a much more serious economic threat, plaintiff decides to sue.

With respect to the principles that inform California law about the statute of limitations in trade secret litigation, we perceive no material difference between the first and the second of these scenarios. We fail to understand why, as a matter of statute of limitations doctrine, plaintiff should be barred in the first scenario but not barred in the second. By hypothesis, the incentives to sue on the occasion of the first breach, and the much greater direct harm caused by the second, are identical in the two scenarios. So there are no real world, practical differences between the two scenarios.

Moreover, since what trade secret law protects (under the UTSA and under the First Restatement of Torts) is not a series of arguably separate "properties" owned by plaintiff, but a right to maintain the integrity of a confidential relationship, it is the first known (or reasonably discoverable) breach of that relationship that creates the right to sue and thus triggers the running of the statute of limitations. The specific nature of the second breach, in relation to the specific nature of the first breach, should make no difference. This follows because California in effect has said to plaintiffs: 'what we will protect is your interest in maintaining or restoring the integrity of a confidential relationship; once you know or should know about a breach of that relationship, it is incumbent on you to take timely steps to repair or remedy the tear in the relationship; and we will not permit you to use our courts to attempt to effect such a repair or remedy if you wait longer than three years to begin the process.' Thus, under California law, it is *any* justiciable breach of the duty of confidence that gives rise to the opportunity to timely use the judicial process to protect plaintiff's interest in maintaining or restoring the integrity of the relationship.

There is another, related way to conceptualize how California authorities approach these issues that bolsters our confidence in our holding. We think it fair to suggest that the concept of 'notice of risk' plays a major role in the relevant statute of limitations law.[20] This idea derives from the combination of two features of the statute of limitations law that the California legislature adopted through the UTSA. One feature we already have emphasized: the rejection of

---

run from the date of the first misappropriation, regardless of whether plaintiff knew or reasonably should have known about the misappropriation. Further amelioration of the potentially harsh effects of rejecting the continuing wrong approach occurred in California as adoption of the UTSA extended the statute of limitations for trade secret type actions from two years to three years.

It also is worth noting that the appearance of harshness in the UTSA's rejection of the continuing wrong approach fades appreciably in light of how UTSA jurisdictions define the interests that are protected by trade secret law. As discussed more fully in the text, California and other UTSA jurisdictions seem to assume that the primary purpose of trade secret law is to protect the integrity of confidential relationships, and that once a plaintiff has notice that a defendant has violated the plaintiff's confidences in any respect, it is unreasonable for that plaintiff to assume that there is no real risk of further violations of the underlying duty and trust.

**20.** This concept played a pivotal role in the District Court's opinion in *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.,* 230 U.S.P.Q. 300 (E.D.Mich.1986), where the court, applying Michigan (not a UTSA jurisdiction) and federal common law, held that the statute of limitations had run on plaintiff's trade secret claims. En route, the court emphasized repeatedly that one principal target of inquiry should be whether the aggrieved party was on actual or constructive notice that defendant appeared to be using some or all of its alleged trade secrets.

the continuing wrong theory (i.e., rejection of the idea that each subsequent act of misappropriation of a trade secret creates a new claim for a plaintiff and begins a new period of limitations). The second relevant feature of the law is its incorporation of plaintiff's "discovery" of the alleged wrong as the trigger for the running of the statute. The legislature rejected the obvious option of having the statute begin running from the date of misappropriation, regardless of whether plaintiff knew or should have known about the misdeed. Instead, the legislature insisted that the statutory period would commence only when the plaintiff discovered the alleged misappropriation or, by the use of reasonable diligence, should have discovered that breach. By simultaneously rejecting the continuing wrong theory and insisting on 'discovery' as the trigger for the statute, the legislature seems to have decided to focus on plaintiff's interest in having real notice that conduct by defendant jeopardized the secrecy of *all* the confidences that plaintiff had shared with that defendant.[21] The underlying principle appears to be that once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should understand that there is a risk that that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences.

In other words, we think it fair to infer that California law assumes that once a plaintiff knows or should know that a particular defendant cannot be trusted with one secret, it is unreasonable for that plaintiff simply to assume that that defendant can be trusted to protect other secrets. This makes sense if, as is the case in California, the law's primary concern is to protect against breaches in or to restore the integrity of confidential relationships. Primacy of that concern suggests a fear that any break in the underlying integrity of a particular relationship puts at risk all the confidences that were shared during that relationship. A law based on these concerns would impose on plaintiffs a responsibility to take prompt and assertive corrective action with respect to all of plaintiffs' interests whenever plaintiffs detect a fracture in a once confidential relationship.

Imposing this responsibility also advances society's interest in preventing avoidable increases in the magnitude of the economic harm (damages) caused by breaches of obligations. One purpose of statute of limitations law is to encourage a party who perceives an alleged wrong to timely take the steps that would enable the wrongdoer to stop the flow of economic blood from the wound. Causing the statute to run from the first rupture of the relationship, at least for all related matters, serves that end.

██ We find some additional support for this inference in the fact that under the UTSA (as adopted in California), mere disclosure, without any unauthorized "use", of a trade secret can constitute "misappropriation" sufficient to create an entitlement to judicial relief (at least of an equitable character) and thus to trigger the running of the statute of limitations. See, e.g., *Ashton–Tate Corporation v. Ross*, 916 F.2d 516 (9th Cir. 1990). This insistence that disclosure (without "use") is sufficient to trigger the statute constitutes another reflection of the California legislature's basic policy decision to focus trade secret doctrine on the integrity of relationships and confidences rather than on concepts derived from the law of property. And the resolution of the issue before us that is most consistent with this focus of trade secret doctrine is the resolution urged by defendants: that the statute should begin running as to all related trade secret claims on the occasion of the first rupture of the relationship about which plaintiff knows or should know.

---

21. *See, e.g.,* Unif. Trade Secrets Act § 6, Comment, 14 U.L.A. 462 (1990). The last paragraph of the Comment to the statute of limitations section of the UTSA states, "This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitations period until an aggrieved person discovers or reasonably should have discovered the existence of the misappropriation. If *objectively reasonable notice of misappropriation* exists, three years is sufficient time to vindicate one's legal rights." (emphasis added).

We also note in passing (without ascribing much significance to the matter), that pleading form permits plaintiffs in cases like this to roll into one "cause of action" or "count" for "Trade Secret Misappropriation" multiple disclosures or uses of an unlimited number of separate trade secrets. While issues of moment should not be resolved on the basis of pleading form, the fact that it is apparently not unusual for parties to include claims about many different trade secrets in one single trade secret "cause of action" may not be wholly irrelevant to parties' and lawmakers' expectations about the reach of a trade secret claim for purposes of the statute of limitations.

There is an aspect of the history of the case at bar that suggests another reason to infer that, absent unusual circumstances, California courts would conclude that the statute of limitations began to run as to all plaintiff's trade secrets once plaintiff discovered, or should have discovered, conduct by defendants that allegedly constituted a breach of their duty of confidentiality. The history of this case demonstrates graphically that, at least in some settings, the task of separating one trade secret from another, or of drawing the definitional lines that determine exactly which things are trade secrets and which trade secrets are in issue in a given case, can be both conceptually elusive and inherently arbitrary.

We begin by pointing out that Intermedics has insisted that the definition of every one of its alleged trade secrets has in common at least one necessary and important element: each definition of plaintiff's alleged trade secrets begins with the phrase "an arrhythmia control device [having, using, or providing something]." *See* Intermedics' Trade Secret Listing dated Oct. 16, 1991 and Olson Dec. re

October 16, 1991 Trade Secret Listing, filed Nov. 19, 1991. Moreover, most of the alleged trade secrets consist of features, components or sub-structures of the micro-electronic circuitry used in "an implantable arrhythmia control device." Thus, as defined by plaintiff, all of its secrets are related, most appear to be closely related, and all exist, if at all, in one specialized, highly technical, medically very sensitive setting.

This backdrop helps expose the significance of the subsequent history of plaintiff's articulations of its trade secrets, and the articulations of its claims of trade secret misappropriation against defendants. The definitions and lists of trade secrets allegedly at issue in this case have proved to be moving conceptual targets. Intermedics has had considerable difficulty deciding how to define its alleged trade secrets and how many of them are in issue here. In May of 1991, in response to a directive from the court, Intermedics identified and defined 39 trade secrets as in issue in this case. Five months later, in October 1991, as a result of an order directing plaintiff to inform defendants whether any of the trade secrets had been published, Intermedics submitted a revised version of the trade secret list, this new edition including 50 allegedly separate trade secrets. In the revision process plaintiff changed the articulation of eight of the alleged trade secrets that had appeared on the earlier list, deleted two alleged secrets that had been on that list, and added thirteen new items.[22] In defending this apparently substantial change in its presentation of the trade secrets in issue, counsel for Intermedics insisted that the "subject matter of the 13 'new' trade secrets overlaps to a very large degree the technology and circuitry of the earlier-listed trade secrets. The same is true of the 8 trade secrets in which language was

**22.** In describing the thirteen new trade secrets, Intermedics emphasized that *"[n]one* of these [new] trade secrets is based in any part on documents produced by defendants after the May, 1991 list was prepared." Olson Dec. re October 16, 1991 Trade Secret Listing at ¶ 7, filed Nov. 19, 1991 (emphasis in original). Intermedics then stated that the subject matter of the "13 'new' trade secrets [was] closely related to subject matter that had already appeared in the May, 1991 listing." *Id.* at ¶ 8. To show how the new trade secrets related to the subject matter of

the May 1991 listing, Intermedics provided a comparative chart. In this chart, for example, Intermedics defined trade secret number 2 from the October 1991 listing as "An arrhythmia control device having a switched capacitor amplifier band gap voltage reference circuit." *Id.* Intermedics compared this to trade secrets 1 and 30 in the May 1991 listing: "Trade secrets 1 and 30 of the May, 1991 list (now numbered 1 and 3) also related to the band gap voltage reference circuit, including specifically a switched capacitor amplifier in the circuit." *Id.*

clarified from the original May, 1991 listing." Olson Dec. re October 16, 1991 Trade Secret Listing at ¶3, filed Nov. 19, 1991. Subsequently, plaintiff added yet another trade secret to the list, designated as number 5.1, reflecting a further modification or refinement of an item earlier claimed. In January of 1992 the Court permitted plaintiff to make additional "corrections" to definitions of two of the alleged secrets from the October 1991 list (numbers 7 and 35). In March of 1992 plaintiff deleted two of the alleged secrets from the October 1991 list. Then in the summer of 1992 plaintiff announced its decision to pursue further in this litigation claims based on only 37 of the remaining alleged trade secrets (which at that juncture numbered 49). Finally, shortly before the November trial that the court had limited to six of the alleged trade secrets, plaintiff attempted to withdraw from its list (and thus from the trial) one of the two alleged trade secrets that had been selected by defendants for litigation at that time.

We describe the history of the mobility of the presentation of these claims not for the purpose of suggesting some criticism of plaintiff or its counsel, but to illustrate the larger and more important point that at least in cases involving subject matter of some subtlety and technical density, as in the case at bar, the process of defining individual trade secrets, or of isolating by definition individual trade secrets from others, can be inherently artificial or arbitrary. There often may be no fixed or generally agreed upon external criteria by which such semantic exercises can be checked or disciplined. These facts of cutting edge technological life, to say nothing of the limitations of language generally, have the effect of giving the person asserting trade secret claims in these kinds of cases very wide definitional latitude, and, with that, considerable power to manipulate the articulation of claims for tactical purposes, e.g., to escape what might otherwise be a perfectly sensible application of the statute of limitations. We think that California authorities would choose not to vest this kind of power, subject to so little principled restraint, in parties to litigation. We think that California authorities would be most troubled, for example, by a scenario in which a plaintiff who clearly knew that most of its related trade secrets had been misappropriated five years before filing its complaint could nonetheless maintain a cause of action by manipulating the definitions of pieces of its intellectual property in order to support a contention that the first misappropriations of some of those pieces took place within the three year statutory period.

The scenario just described exposes fundamental policy concerns that underlie statute of limitations doctrines generally that could be seriously jeopardized by an approach that permitted the statute to begin to run separately for each of many trade secrets that were artificially separable but which were obviously related in many meaningful real world ways. First, as defendants repeatedly point out, such an approach would make it extremely difficult for persons who might be targets of trade secret litigation ever to achieve the repose that statute of limitations law is supposed to promise them at some point. That "repose" is important not simply to potential defendants and not simply as a life style value. The "repose" about which statute of limitations law cares most is not reflected in economic hammocks, but is better characterized as a kind of confidence about legal circumstances that permits and encourages people to move forward energetically and boldly with new economic development, free from fear that the fruits of their labor will be stripped from them as a result of trade secret litigation. The law's ability to provide people with that kind of confidence would be badly compromised if parties could escape the bar of the statute of limitations (and thus impose the heavy economic and psychic burdens of litigation on competitors) by artful manipulation of the definitions of related trade secrets.

Permitting parties thus to avoid the bar of the statute also would compromise another important interest that statute of limitations doctrine is designed to protect: the interest in protecting courts from being required to conduct trials of cases where much of the important evidence is so old that the odds of doing justice are intolerably low. The case at bar suggests some of the ways that this

interest could be threatened. The trial of the trade secrets that remain in dispute here (some 31 in number) could not take place before the end of 1993. Plaintiff contends, however, that its employees developed these trade secrets between 1983 and mid–1985. Defendants Pless and Sweeney left Intermedics' employ in mid–1985. Their exposure to the alleged trade secrets occurred before their departure. Moreover, plaintiff alleges that the defendants formed a conspiracy to misappropriate the alleged trade secrets during the latter part of 1984 or the first part of 1985. During the trial in late 1992 plaintiff focused considerable evidentiary attention on events and conversations that allegedly occurred in meetings in late 1984 and early 1985, as well as on very technical, detailed product development matters from this time period, some eight years ago. Needless to say, memories were strained, sometimes arguably past the breaking point. The problem would be more severe in a trial a year later. While we do not mean to imply that, because of the passage of time and the character of the subject matter in issue here, a fair trial on these issues in late 1993 is impossible, we do suggest that concern about the capacity of the judicial process to deliver justice so long after the fact is real and is legitimately a factor that California authorities could be expected to take into account in resolving the issue before us about how to construe and apply the statute of limitations in a case like this.

For all the reasons set forth above, we conclude that California courts would hold that, at least absent unusual circumstances, when the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at that same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets, at least when the plaintiff shared all the trade secrets with defendants during the same period and in connection with the same relationships and when the trade secrets concern related matter.

### Application of California Law to Case at Bar

Given our resolution in the preceding sub-section of the key legal issue, ruling on the motion for summary judgment as it applies to the alleged trade secrets that were not presented to the jury in the trial late last year is a relatively straightforward matter.

The remaining trade secret claims would sound against the same defendants. Plaintiff always has contended that it shared its trade secrets with defendants Pless and Sweeney during their tenure as employees at Intermedics, a tenure that ended for both of these defendants in mid–1985. Plaintiff also always has contended that defendant Ventritex acquired access to all of the alleged trade secrets through defendants Pless and Sweeney. Thus, the duties that gave rise to all the misappropriation claims arose during one time period and through one set of employment relationships.

Moreover, plaintiff always has contended that all of its trade secrets are related: all were developed during the same period for possible use in the same sophisticated and highly specialized product, a product whose features, functions, and components, according to plaintiff's evidence at trial and its pretrial submissions, are interdependent and subject to severe option constraints by the extremely demanding and sensitive environment in which the product must operate. And the vast majority of the alleged trade secrets relate, on their face, to the even more limited sub-world of the micro-electronic circuity that could be used in an implantable arrhythmia control device. As indicated in an earlier section, additional evidence (if any were needed) of the relatedness of these design ideas is reflected in the history of Intermedics' efforts to define and separate from one another its alleged trade secrets. When it expanded its list of allegedly protected items from 38 to 51 in late 1991, plaintiff insisted that the "subject matter of the 13 'new' trade secrets overlaps to a very large degree the technology and circuitry of the earlier-listed trade secrets. The same is true of 8 trade secrets in which language was clarified from the original May, 1991 list-

ing."[23]   Olson Dec. re October 16, 1991 Trade Secret Listing at ¶3, filed Nov. 19, 1991.

It also is noteworthy that, as a result of the way plaintiff defined its alleged trade secrets as existing *only* in the context of an *implantable* arrhythmia control device, all the alleged misappropriations by these defendants could have occurred only in connection with their efforts to develop *one* product, an implantable defibrillator intended for head-to-head competition with plaintiff's product in a specialized market niche.   And it is by no means insignificant that, indisputably, Ventritex's overriding business purpose, from the date of its founding through the present, has been *to develop and market commercially an implantable arrhythmia control device* that plaintiff has known, at least from the time it filed its first lawsuit in 1985 against these defendants, would compete directly with plaintiff's implantable arrhythmia control device.[24]

Given all these circumstances, California courts would hold that it would have been unreasonable for Intermedics to assume that the statute of limitations did not begin to run on all of the trade secret claims reached by this litigation at the same time.   Under the findings by the jury, Intermedics clearly should have been on notice, back in the early spring of 1986, that, under its own definitions of its trade secrets, there already had been a rupture in the confidential relationships it had had with defendants Pless and Sweeney and that defendant Ventritex was the beneficiary of that rupture.   Given that notice of rupture, it was incumbent on Intermedics to file suit within three (or, perhaps, four) years as to *all* the related trade secrets that it had shared with Pless and Sweeney and whose

confidentiality was jeopardized by their employment at Ventritex, even if there was no specific evidence with respect to *some* of the trade secrets that, at that time, defendants had in fact misappropriated them.

Most of what we have said in this section also applies to the civil conspiracy claim as it relates to the trade secrets which were not the subject of the 1992 trial.   So does most of what we said in the earlier section where we ruled that the statute of limitations would bar the conspiracy cause of action as to the six design ideas that were the subject of that trial (even if those design ideas were deemed "secret").   In short, given the related nature of the remaining trade secrets, and California law's insistence that misappropriation is not a continuing wrong, the jury's findings of fact compel the conclusion that plaintiff knew or should have known, by April 10, 1986, the facts that were necessary to press the conspiracy claim as to all of the remaining trade secrets.   And because we have rejected the suggestion that a new statutory period begins each time a defendant, after already achieving the essential object of the alleged conspiracy, may have committed another arguably separable act of misappropriation, we see no reason not to hold that the statute of limitations also bars the conspiracy claims based on any alleged misappropriations of any of the design ideas that plaintiff has claimed in this litigation.

We believe that the circumstances described in the preceding paragraphs would lead California courts to hold that the statute of limitations began running at the same time with respect to all the claims arising out of misappropriation of any and all of the alleged trade secrets or confidential information that plaintiff has presented in this litigation.   We

---

**23.** Earlier in the same Declaration, Mr. Olson (who appears to have been the author of the trade secret listings presented in this case, see trial testimony of Dr. Lawrence Stotts, Intermedics' Vice President of Engineering) opined that "The revised list is substantially the same as the first list, except that the revised list is more precise and more complete."   Olson Dec. re October 16, 1991 Trade Secret Listing at ¶4, filed Nov. 19, 1991.

**24.** *See, e.g.,* Plaintiff's Original Petition and Application for Temporary Injunction ¶18, filed

December 5, 1985, in the Texas district court sitting in Brazoria, Texas, where plaintiff alleged that "Ventritex is engaged in developing a substantially similar device intended to perform essentailly [sic] the same function as the Project made the basis of the confidentiality agreement [plaintiff's implantable defibrillator].   Ventritex intends to design, engineer, manufacture and/or market its pirate version of the implantable defibrillator and, in the process, will utilize Intermedics [sic] confidences and trade secrets being disclosed by its former employees."

therefore HOLD that the jury's findings in the trial late last year compel the conclusion that the statutory period had expired on all claims arising out of or dependent on alleged misappropriation of any of the remaining design ideas before plaintiff filed this lawsuit in late April of 1990. On this basis we GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with respect to all remaining state law claims arising out of alleged misappropriation of any of plaintiff's alleged trade secrets or confidential information.

There is an additional consideration, not essential to our holding, that supports the fairness of the result we reach. As noted earlier, the court limited the initial trial in this litigation to six trade secrets. The court did not, however, select which trade secrets would be tried. Instead, it permitted plaintiff to select four of the secrets and defendant to select (from plaintiff's then current list) the remaining two. While the court urged counsel, when making their selections, to consider the possible preclusive effects of the initial trial on other aspects of this litigation, as well as the effects the first trial might have on subsequent settlement negotiations, the court imposed no limits or restraints at all on the choices made by the parties. In this setting, it would be surprising, to understate the matter, if all four of the trade secrets picked by plaintiff for the trial were at the margins of the case, as plaintiff perceived it. Rather, one would expect plaintiff to have chosen at least one or two secrets which plaintiff perceived as in some sense representative of other, related claims and as vehicles for plaintiff to make as strong a case of misappropriation as possible. In other words, it seems fair to assume that plaintiff would have chosen trade secrets whose misappropriation would have represented a serious, material breach of the relationship of trust and confidentiality that it once had with defendants Pless and Sweeney. Our confidence that this assumption is fair is increased by the fact that the four alleged trade secrets selected by plaintiff obviously are related to others on plaintiff's list.[25] The fact that plaintiff was given an unfettered opportunity to select four trade secrets for the initial trial, coupled with the apparent connection between those trade secrets and others on plaintiff's list, reduces substantially the likelihood that a breach that consisted of misappropriation of these trade secrets would have been perceived by plaintiff in early 1986 as immaterial or inconsequential, and thus reduces substantially the likelihood that applying the rule we announce today to plaintiff is unfair.

## V.

### PLAINTIFF'S COUNTERMOTION

Plaintiff's countermotion, being supported only by a non-sequitur, is DENIED.

## VI.

### SUMMARY OF RULINGS

The court hereby ORDERS entry of SUMMARY JUDGMENT in favor of defendants PLESS and SWEENEY on *all* of the claims in the instant action that arise out of or depend on alleged misappropriation of *any* of plaintiff's alleged trade secrets or confidential information, including the causes of action that sound in misappropriation (under Texas or California law), breach of contract, breach of fiduciary duty, and civil conspiracy.

The court further ORDERS entry of SUMMARY JUDGMENT in favor of defendant VENTRITEX on *all* of the claims in the instant action that arise out of or depend on alleged misappropriation of *any* of plaintiff's alleged trade secrets or confidential information, including the causes of action that sound in misappropriation (under Texas or California law), unfair competition, inducement to misappropriate, inducement to breach contractual obligations, inducement to breach fiduciary obligations, and civil conspiracy.

IT IS SO ORDERED.

---

25. *See, e.g.,* Olson Dec. re October 16, 1991 Trade Secret Listing at ¶ 8, filed Nov. 19, 1991, where counsel for Intermedics describes some of the ways trades secrets 4, 5, 6, 7 and 39 are related. There also are language-apparent connections between alleged trade secrets 22, 23, 24, 25, 26, 27, 28, 29, and 36, as well as between numbers 30–35.