Mitchell D. FORCIER,
et al., Plaintiffs,

v.

MICROSOFT CORPORATION,
et al., Defendants.

No. C 99–01989 SBA.

United States District Court,
N.D. California.

Nov. 13, 2000.

Edward W. Goldstein, David J. Healey, Stephen L. Lundwall, Goldstein & Healey, Houston, TX, David Eiseman, Diane C. Hutnyan, Quinn, Emanuel, Urquhart, Oliver & Hedges, L.L.P., San Francisco, CA, for plaintiff.

Henry C. Bunsow, Kara M. Andersen, Lloyd Farnham, Keker & Van Nest, San Francisco, CA, for defendants Aha! Software Corp. and Greg Stikeleather.

J. Christopher Carraway, Michael P. Girard, Joseph T. Jakubek, John D. Vandenberg, Klarquist Sparkman Campbell Leigh & Whinston, Portland, OR, Allen Ruby, Glen Schofield, Ruby & Schofield, San Jose, CA, for defendants Microsoft Corp., Casio, Inc., Compaq Computer Corp., Hewlett–Packard Co., & Sharp Electronics Corp.

## ORDER

ARMSTRONG, District Judge.

This matter comes before the Court on (1) the Motion of defendants Aha! Software Corporation (hereinafter "Aha!") and Greg Stikeleather for Summary Judgment on Plaintiffs' Second, Third, Fourth, Fifth, and Sixth Claims; (2) the Motion of Defendant Microsoft Corporation (hereinafter "Microsoft") for Partial Summary Judgment on Counts Two and Six; and (3) the Motion of plaintiffs Mitchell D. Forcier and Marathon Development Corporation (hereinafter "Marathon") for Leave to file Second Amended Complaint. Having read and considered all the papers filed in connection with this motion, having considered the arguments advanced by the parties and being fully informed, the Court GRANTS defendants' Motions for Summary Judgment of plaintiffs' second, third, fourth, fifth, and sixth claims, but DENIES defendant Aha!'s request for sanctions, GRANTS plaintiffs' Motion for Leave to further Amend their complaint to include certain miscellaneous allegations, but DENIES the motion to the extent that plaintiffs seek to include a claim for tortious interference, and GRANTS the parties request for an order permitting defendants to file amended answers and counterclaims.

### I. *BACKGROUND*

Plaintiff Mitchell D. Forcier alleges that he pioneered the development of ink processing technology, which allows pen-based computer systems to process electronic ink in a manner analogous to how word processing programs manipulate typed text. (First Amended Complaint (hereinafter "FAC") ¶¶ 14–15)

In late–1989, Forcier, through his company Marathon Development Corporation ("Marathon"), began working as an inde-

pendent software vendor for GO Corporation ("GO"), a company attempting to develop an operating system for pen-based computers. (FAC ¶ 16) In April of 1990 and, again, in December of 1990, Forcier signed nondisclosure agreements with GO to protect his intellectual property. (Forcier Dec. ¶¶ 4–6, Ex.s 1–2) The first agreement contained no time limit, but expressly excluded from its coverage any information that became "known or generally available to the public through no fault" of GO. (Forcier Dec.Ex. 1) The second agreement was signed by defendant Greg Stikeleather on behalf of GO and expressly included a two-year time limit on its effectiveness. (Forcier Dec.Ex. 2; Farnham Dec., Ex. A (hereinafter "Stikeleather Dec.") ¶ 4, Ex. 1) In addition, it stated that GO had no obligations with respect to information provided pursuant to it if (1) that information became "generally known" through "no act or failure" on its part, or (2) Marathon furnished the information to others without a restriction on disclosure. (Forcier Dec.Ex. 2)

Subsequently, Greg Stikeleather left GO to form Aha! In February, 1991, he asked Forcier to join his new company. Forcier did not immediately accept. (FAC ¶ 18) In June of 1991, however, he agreed to disclose information to Aha! concerning "a Pen–Based Script, Text and Drawing processor" that he had developed pursuant to a new confidentiality agreement executed on June 21, 1991. (Forcier Dec. ¶ 11, Ex. 4; Stikeleather Dec. ¶ 5, Ex. 2) This agreement also contained a time limit. According to its terms, the "obligation of confidentiality [was to] expire three (3) years from the date of the last disclosure" made pursuant to it. The agreement also expressly excluded information that entered "the public domain" through no fault of Aha! Greg Stikeleather signed the agreement on behalf of Aha! (*Id.*)

Following the execution of this document, Aha! and Forcier discussed the possibility of Forcier's going to work for Aha! On September 17, 1991, Forcier signed a letter agreeing to become an employee of Aha! (Farnham Dec. ¶ 3, Ex. B, 139:3–19; Forcier Dec. ¶ 18) This agreement did not last, however, and on October 14, 1991, Forcier terminated his relationship with Aha! (Stikeleather Dec. ¶ 7, Ex. 4; Forcier Dec. ¶ 19) Forcier did not disclose any further information to Aha! that he considered confidential or trade secret after October 10, 1991. (Vandenberg Dec. ¶ 1, Ex.s 2, 3 (at 43:6–13), 4 (at 16:13–14)).

About a year later, on October 1, 1992, an international Patent Cooperation Treaty ("PCT") patent application that Forcier had filed was published. (Vandenberg Dec. ¶ 1, Ex. 5) That patent application disclosed fifteen or seventeen of Forcier's alleged trade secrets. (Vandenberg Dec. ¶ 1, Ex.s 5, 6, and 7; Lundwall Dec., Ex. B) Forcier understood that the applications would be available for the public to see once they were published. (Vandenberg Dec. ¶ 1, Ex. 7 at 18:18–24) Between February and May of 1993, he also sent copies of the application to several companies, including Microsoft, Apple, and IBM, advising them that the information contained in the application was in "the public domain". (*Id.*, Ex.s 8–11)

Several months later, on May 20, 1993, Aha! filed a patent application for its InkWriter product with the U.S. Patent and Trademark Office. (Vandenberg Dec., ¶ 1, Ex. 14) Plaintiff alleges that this application contained seven of his trade secrets. (Lundwall Dec., Ex. B)

Then, on June 14, 1993, Aha! announced the impending release of the InkWriter product (described as a technology to process handwriting and edit handwritten letters and words). (Stikeleather Dec. ¶ 9, Ex. 6) Following this announcement, the product, was the subject of numerous newspaper articles describing its technology and functionality. (Stikeleather Dec. ¶ 10, Ex.s 7–8)

Forcier saw one such article in the Wall Street Journal in May or June, 1993. (*Id.*, Ex.s 12 and 13 (at 22:23–23:20; Forcier

Dec. ¶¶ 22–24)) The article caused him to suspect that Aha! had violated the confidentiality agreement and that it was using his trade secrets. (*Id.,* Ex. 13 at 23:14–18, 158:15–21) He contacted an attorney to discuss the possibility of legal action, but did not file suit. (*Id.,* Ex. 13 at 22:21–23:20, 89:2–11)

On June 15, 1993, the U.S. Patent and Trademark Office issued Forcier a patent (No. 5,220, 649 ("649")). (Forcier Dec. ¶ 25; Vandenberg Dec. ¶ 1, Ex. 15) That patent disclosed seventeen of Forcier's alleged trade secrets. (Lundwall Dec., Ex. B)

On June 22, 1993, Forcier sent Aha! a letter enclosing a copy of his PCT application and advising it of his patent. He told Aha! that it would have to pay royalties to sell products that incorporated his patented claims, but made no express reference to the 1991 non-disclosure agreement or to any allegation that Aha! had violated the agreement by using information covered by it. (Forcier Dec. ¶ 25, Ex. 10) Aha!'s attorneys wrote back a week later denying that the company was infringing any rights delimited in Forcier's U.S. Patent or PCT application. (Vandenberg Dec.Ex. 17)

About one month later, on July 27, 1993, the U.S. Patent and Trademark Office issued a second patent to Forcier (No. 5,231,698 ("698")). (Vandenberg Dec.Ex. 18). This patent also disclosed about 17 of Forcier's alleged trade secrets. (Lundwall Dec.Ex. B)

In October, 1993, Forcier read an article in *Byte* magazine reporting that the Aha! InkWriter product was commercially available. (Vandenberg Dec.Ex.s 19 & 20 (at 23:25); Forcier Dec. ¶ 27) He had his wife order a copy of the software. (Vandenberg Dec.Ex. 20, 23:25) The software arrived in November, 1993 with a 100–page user's manual and a 12–page quick-reference guide. (*Id.* Ex.s 23 and 24) The inside page of the manual indicated that Aha! had a patent pending on the product. (*Id.* Ex. 23, bate stamp FOR 002764)

At some point between November 1993 and January 1994, Forcier spent a day testing the software. Based on the results, he became concerned that some of the information that he had disclosed had been incorporated into the product. (Vandenberg Dec., Ex. 25, 21:5–22:7; Forcier Dec. ¶ 27) Forcier alleges that Aha!'s InkWriter product specifically used three of his alleged trade secrets. (Vandenberg Dec., Ex.s 25 (at 102:13–24, 103:11–14) & 36 (p. 3)). He suspected that it might use others as well. (*Id.* Ex. 25 at 24:8–18, 25:24–26:8, 39:21–40)

Rather than take immediate action to protect his alleged trade secrets, however, Forcier decided to test the software further. In order to do so, he needed to obtain another device to run the software. He had rented such a device previously. Now, he was advised by the AT & T salesperson with whom he spoke that the product line was being discontinued and the devices no longer were available. (Forcier Dec. ¶¶ 27–28)

Accordingly, on April 15, 1994, Forcier's attorney sent Aha! a letter stating that it appeared the device that ran the software was no longer available and asking whether Aha! still was selling the software. Forcier's counsel's letter said nothing about the 1991 non-disclosure agreement or any violation of it. (Forcier Dec. ¶ 29, Ex. 11) On May 17, 1994, Aha! responded with a letter denying that its software infringed Forcier's patents and stating that it believed the device to run the software still could be purchased. (Forcier Dec. ¶ 29, Ex. 12) Aha!'s letter did not say whether the software still was available.

Forcier did not contact Aha! again after this, nor did he notify it in any way that he believed the company had violated their 1991 confidentiality agreement, until he filed suit in 1999. (Vandenberg Dec., Ex. 28, 70:17–71:9) He claims he understood from newspaper and magazine articles at the time that the bottom was falling out of the pen-based computing market. (Forcier Dec. ¶ 30) In late–1994, he drove by

Aha!'s offices, did not see the company's sign or any cars that he recognized in the parking lot, and concluded that the company must have gone out of business. For that reason, he claims, he decided not to pursue legal action. (Forcier Dec. ¶¶ 31–32)

During June and July of 1994, the second version of Aha!'s InkWriter product received further national attention. (Vandenberg Dec.Ex. 29) Thereafter, on December 8, 1994, Aha!'s InkWriter-related international patent application was published. (*Id.* Ex. 30) Forcier claims that this application disclosed all of his trade secrets that had not previously been published by his own patents. (*Id.*, Ex.s 6, 7 (at 109:9–22), 36 (at 2)) By December 31, 1994, all of Forcier's alleged trade secrets had been described either in the patents or published patent applications that he and Aha! filed. (*Id.*, Ex.s 7 (at 109:9–22), 36 (at 2))

Between December, 1994 and May, 1995, Aha!'s third version of the InkWriter product received national press attention. (*Id.* Ex. 31) In June, 1995, it's fourth version of the product garnered further attention. (*Id.* Ex. 32) Then, on March 26, 1996, Aha! sold its InkWriter product line and rights to its pending patent applications to defendant Microsoft Corporation. Aha! and Microsoft publicly announced the sale in a press release dated April 8, 1996. (Stikeleather Dec. ¶ 18, Ex. 15; Vandenberg Dec.Ex. 33) The same month, Microsoft hired two former Aha! employees (Dan Altman and Charlton Lui) and put them to work incorporating and developing Aha!'s ink processing technology into Microsoft products and assisting in filing and prosecuting patent applications related to that technology. (Lundwall Dec.Ex.s E (at 28–29, 21–33, 35–36, 58–61, 220–21) & F (at 94–99, 103–07, 127–29))

Forcier claims that he heard of the sale several months later and, only then, realized that Aha! had not gone out of business. (Forcier Dec. ¶ 33) His attorney contacted Microsoft in July 1996 to advise it of his claims that Aha! had misappropriated his technology and infringed his patents. (Forcier Dec. ¶¶ 36–38, Ex.s 15–17) Forcier's attorney and Microsoft conferred by letter and telephone but reached no agreement concerning Forcier's claims. (Forcier Dec. ¶ 36)

In April 1999, Forcier filed suit against Aha! and Microsoft (and others) alleging *inter alia* (1) misappropriation of trade secrets and unfair competition as against both Aha! and Microsoft, and (2) breach of contract, fraud, and constructive fraud as against Aha! (FAC ¶¶ 36–57) Aha! and Microsoft filed motions for summary judgment with respect to these claims.

Plaintiff also has filed a motion for leave to file a second amended complaint ("SAC") so that he may add (1) a claim for tortious interference with contract against Microsoft, and (2) clarification concerning the relief sought against Microsoft. Microsoft opposes the first, but not the second, proposed amendment. Microsoft and all other parties have stipulated, however, that the defendants be permitted to file Amended Answers and Counterclaims. They seek an order from the Court granting them permission to do so.

## I. *DISCUSSION*

### A. *Defendants' Motions for Summary Judgment*

#### 1. *Standard of Review*

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant meets this burden, the nonmoving party

must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## 2. *Statute of Limitations*

### a) *Claim 2:* The Trade Secret Misappropriation Claim

"California's statute of limitations for claims based on alleged misappropriation of trade secrets is set forth in Civil Code section 3426.6, which adopts an identical provision of the [Uniform Trade Secrets Act ('UTSA') ]." *Intermedics, Inc. v. Ventritex, Inc.*, 822 F.Supp. 634, 643 (N.D.Cal. 1993). Section 3426.6 provides that

> [a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.

Section 3426.6 also provides that, "[f]or the purposes of this section, a continuing misappropriation constitutes a single claim." This statement reflects a "rejection of the continuing wrong theory (i.e., rejection of the idea that each subsequent act of misappropriation of a trade secret creates a new claim for a plaintiff and begins a new period of limitations)." *Intermedics, supra*, 822 F.Supp. at 653–54.

In *Intermedics, supra*, the district court considered the implications of these two provisions of Section 3426.6, and also related authority interpreting both that section and the parallel provision of the UTSA. Based on this review, it concluded:

> By simultaneously rejecting the continuing wrong theory and insisting on 'discovery' as the trigger for the statute, the legislature seems to have decided to focus on plaintiff's interest in having real

notice that conduct by defendant jeopardized the secrecy of all the confidences that plaintiff had shared with that defendant. [Citation omitted.] The underlying principle appears to be that *once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should know that there is a risk that that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences.*

*Intermedics, supra*, 822 F.Supp. at 654 (emphasis added). *See also, Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 293 (9th Cir.1969) (the "fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated"); *Glue–Fold, Inc. v. Slautterback Corp.*, 82 Cal.App.4th 1018, 98 Cal.Rptr.2d 661, 666 (2000) ("We agree with the federal court [in *Intermedics* ] that 'California law assumes that once a plaintiff knows or should know that a particular defendant cannot be trusted with one secret, it is unreasonable for that plaintiff simply to assume that defendant can be trusted to protect other secrets").

Based on this reasoning, the district court in *Intermedics* found that the law imposed on plaintiffs "a responsibility to take prompt and assertive corrective action with respect to all of [their] interests whenever [they] detect a fracture in a once confidential relationship." *Id.* Consistent with this principle, it concluded that,

> when the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at the same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets, at least when the plaintiff shared

all the trade secrets with the defendants during the same time period and in connection with the same relationships and when the trade secrets concern related matters.

*Id.* at 657 (emphasis added). *See also, Glue–Fold, Inc., supra,* 82 Cal.App.4th at 1026, 98 Cal.Rptr.2d 661 (affirming the "unanimous conclusion of . . . federal courts construing section 3426.6 [including the district court in *Intermedics* ] . . . that it is the first discovered (or discoverable) misappropriation of a trade secret which commences the limitation period"). This is true even where the secrets at issue were sold to a third-party and used again years later. *See, Ashton–Tate Corp. v. Ross,* 728 F.Supp. 597, 603 (N.D.Cal.1989) (ruling that the initial act of misappropriation by one party began the running of the statute of limitations for that party and, also, for a third party who obtained the trade secrets from the first party and then used them for their own purposes).

■ In this case, it is undisputed (1) that Forcier disclosed all of the alleged trade secrets at issue to Aha! between June and October of 1991 (Vandenberg Dec. ¶ 1, Ex.s 2–4); (2) that all of those disclosures (a) were made pursuant to the June 1991 non-disclosure agreement between Forcier and Aha!, and (b) were related to Forcier's development of a "Pen–Based Script, Text and Drawing Processor" (Forcier Dec.Ex. 4); and (3) that the disclosures were made for the purpose of permitting Aha! to evaluate the technology so that it might "decide whether . . . to enter into an agreement for development, manufacture and/or marketing" of the "Pen–Based Script, Text and Drawing Processor". (Forcier Dec.Ex. 4). Thus, the duties that gave rise to Forcier's claims based on misappropriation arose during one time period and through one relationship. Moreover, the alleged trade secrets at issue all are related because they were developed for use in the same sophisticated and highly specialized product. Accordingly, the statute of limitations

began to run on all of these claims when Forcier first discovered (or reasonably should have discovered) that an alleged misappropriation of a trade secret had occurred.

Forcier admits (1) that he suspected Aha! had misappropriated his alleged trade secrets "in the summer of 1993" after he read a *Wall Street Journal* article that mentioned "inkwriting software developed by aha!", and (2) that, by late-November, after he spent a day testing Aha!'s software, he was "convinced" misappropriation had occurred. (Pl.'s Opp. at 6:15–7:1) By his own admission, therefore, he had actual notice of an alleged act of misappropriation by 1993. His claims based on that alleged wrong, initiated in April 1999, more than five years later, therefore were barred by Section 3426.6. *See, Glue–Fold, Inc. supra,* 98 Cal.Rptr.2d at 668 (reaching the same result where the undisputed evidence showed that the plaintiff had actual notice of the misappropriation of its trade secret by August of 1995, but failed to file suit until January 1999).

■ Forcier's claim that the statute should be tolled because he erroneously concluded that Aha! had gone out of business and that any misappropriation, therefore, had ceased, runs directly contrary to the recent holding of the California court of appeal in *Glue–Fold, Inc., supra,* and the Court, therefore, rejects it. *See Glue–Fold, Inc., supra,* 98 Cal.Rptr.2d at 665–68 (rejecting the plaintiff's argument that, although it first "discovered" an alleged misappropriation in August of 1995, the statute of limitations did not begin to run until mid–1996, because the plaintiff "mistakenly believed" that the defendant "would desist" from further misappropriations, and affirming "that it is the first discovered (or discoverable) misappropriation of a trade secret which commences the limitation period").

Accordingly, the Court GRANTS defendants' motions for summary judgment with respect to plaintiff's second claim for relief for alleged misappropriation.

### b) *Claims 3–6:* Claims Based on Alleged Misappropriation

■ Forcier argues that his other third, fourth, fifth, and sixth claims (for fraud, constructive fraud, breach of contract, and unfair competition) raise separate and independent claims and, consequently, that a new period of limitations accrued for each wrongful act alleged in support of them. The Court does not agree.

A review of the First Amended Complaint confirms that each of these four claims incorporates by reference, and relies upon, the allegations set forth in support of Forcier's second claim for misappropriation. In essence, all of these claims are based on the allegation that the defendants improperly used and disclosed Forcier's confidential trade secrets in order to design and develop ink-processing technology, and to obtain patents based on that technology.[1] The Court agrees with the district court in *Intermedics, supra,* that "it would be 'anomalous' to reject the continuing tort doctrine for purposes of [the plaintiff's] claims of misappropriation of trade secrets or confidential information, but to accept an analogous 'continuing breach' doctrine for purposes of [other claims] that are based on the same alleged misappropriations." *Intermedics, supra,* 822 F.Supp. at 646 (holding that "the statute of limitations began running at the same time with respect to all the claims arising out of misappropriation of any and all of the alleged trade secrets or confidential information", including breach of contract and unfair competition). *Accord, Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.,* 909 F.Supp. 1353 (C.D.Cal. 1995) (dismissing *inter alia* state law claims for misappropriation, fraud, and unfair competition as barred by the statute of limitations based on allegations demonstrating that the alleged misconduct at issue constituted "a single, irrevocable wrong").

Because the Court concludes that Forcier's claims for fraud, constructive fraud, breach of contract, and unfair competition all arose out of the alleged misappropriation of his alleged trade secrets, it finds that the statute of limitations on all five claims began running at the same time. The statute of limitations on Forcier's fraud claims is three years. Cal.Code Civ. Proc. § 338(d); *County of Santa Cruz v. McLeod,* 189 Cal.App.2d 222, 229, 11 Cal. Rptr. 249 (1961). The statute of limitations on his breach of contract and unfair competition claims is four years. Cal.Code Civ.Proc. § 337(1); Cal.Busi. & Prof.Code § 17208. Accordingly, the longest applicable statute of limitations for any of the five claims against Aha! and Microsoft is four years. Given that the statute of limitations began running in 1993, his failure to file this suit until 1999 (more than five years later) means that these claims are barred.

A contrary result would not be required even if the Court did agree with the plaintiff that the third, fourth, fifth, and sixth claims were based on an independent wrong, namely, the alleged wrongful assertion of ownership, because the statute of limitations on these claims then would have begun to run either when the claim first accrued or when Forcier reasonably should have discovered that it accrued. Aha! publicly announced its release of the

---

1. Forcier argues (1) that some or all of these claims rely on an allegation that the defendants wrongfully asserted ownership of his trade secrets, (2) that this allegation is distinct from the allegations presented in support of his misappropriation claim, and (3) that the limitations period for this alleged wrong therefore should be considered to have accrued separately. This argument is not supported by the allegations of the First Amended Complaint, which alleges in support of the misappropriation claim that defendants wrongfully used his trade secrets to develop ink-processing technology and, then, to obtain patents on that technology. (FAC ¶ 39) In order to obtain a patent, the defendants necessarily would have had to represent the technology at issue as their own. Consequently, the allegation that defendants wrongfully asserted ownership of his trade secrets is included by implication in the misappropriation claim as well.

InkWriter product, which allegedly incorporated most or all of Forcier's trade secrets, in 1993, thereby representing the new technology as its own. Forcier also discovered that Aha! was representing the technology as its own in 1993 when he read articles announcing the product and received a copy of the software with a manual confirming that Aha! was seeking a patent on it. Accordingly, the statute of limitations began running in 1993 in any case and had long expired by the time Forcier filed suit.

Because the statute of limitations also has expired on Forcier's third, fourth, fifth, and sixth claims, the Court GRANTS defendants' motions for summary judgment with respect to them as well.[2]

### 3. Claim 2 (as against Microsoft): Trade Secret Status

█ Even if Forcier's second claim for trade secret misappropriation were not barred by the statute of limitations, it still would fail as against defendant Microsoft because the undisputed facts establish that Forcier's alleged "trade secrets" no longer were "secret" by the time that Microsoft purchased Aha!'s technology in 1996.

Under California law, a person cannot be held liable for misappropriation unless he or she unlawfully acquires, discloses, or uses information that is a "trade secret". *See*, Cal.Civ.Code § 3426.1 (defining "misappropriation" to mean "(1) Acquisition of a *trade secret* of another ..; or (2) Disclosure or use of a *trade secret* of another ...") (emphasis added). Information will be considered a "trade secret" if it

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other person who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d). "In light of this requirement of secrecy, it is clear that an unprotected disclosure of the holder's secret terminates the existence of the trade secret." *Stutz, supra,* 909 F.Supp. at 1359 (citing *Vacco Indus., Inc. v. Van Den Berg,* 5 Cal.App.4th 34, 50, 6 Cal.Rptr.2d 602 (1992), *review denied* ).

"It is well established that the disclosure of a trade secret in a patent places the information comprising the secret into the public domain. [Citation omitted.] Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and 'the patentee's only protection is that afforded under the patent law.' [Citation omitted.]" *Stutz, supra,* 909 F.Supp. at 1359. Here, it is undisputed that all of Forcier's alleged trade secrets had been placed in the public domain either in patents or in patent applications that Forcier and Aha! filed by December 31, 1994, more than a year before Microsoft purchased the technology from Aha! (Vandenberg Dec., Ex.s 7 (at 109:9–22) & 36 (at p. 2)) Consequently, the element of secrecy was gone by the time that Microsoft acquired the informtion, the "trade secret" status was extinguished, and Forcier can have no claim for misappropriation as against Microsoft.[3]

**2.** Because the Court GRANTS defendants' motions for summary judgment of the sixth claim on statute of limitation grounds, it need not decide defendant Microsoft's argument in the alternative that the claim is barred because state and federal law preempt it. Any ruling on this argument would require the Court to decide whether California's Trade Secret Act affirmatively preempts civil remedies (other than contract remedies) that are based upon misappropriation of a trade secret, under California Civil Code section 3426.7(b). Because any such ruling would require the Court to render an opinion on a subject that has not yet been addressed by any California state court and because such a ruling here is unnecessary, the Court declines to address it.

**3.** Forcier cites the Court's September 27, 2000 Order as support for his argument that the trade secret status was not lost. His reliance is misplaced, however, because that Order confirmed that Microsoft could obtain dismissal of the second claim if it demonstrated that the information at issue no longer

On this basis as well, therefore, the Court GRANTS Microsoft's motion for partial summary judgment with respect to the second claim for misappropriation.

### 4. Sanctions

■ Defendant Aha! contends that Forcier and Marathon asserted a claim of misappropriation in "bad faith" and, therefore, that sanctions should be imposed pursuant to California Civil Code section 3426.4.

Sanctions are available under this section "as a deterrent to specious claims of misappropriation ..." M. Jager, Trade Secrets Law, APP.A1 at 13 (1988). "To be deterrable, conduct must be at least reckless or grossly negligent, if not intentional or willful." *Stilwell Development, Inc. v. Chen,* 1989 WL 418783 (C.D.Cal.) (evaluating a claim for sanctions under section 3426.4). The deterrent purpose of section 3426.4 also "requires subjective misconduct.", *e.g.,* some evidence that the plaintiffs "knowingly and intentionally prosecuted a specious claim." *Id.* The Court finds no such evidence in this case. While plaintiffs' claims are barred, they are not specious. Plaintiffs presented evidence to support their claims and vigorously pursued them. There is no evidence to suggest that plaintiffs lacked confidence in the merit of their claims based on misappropriation.

### B. Plaintiffs' Motion for Leave to File Second Amended Complaint

### 1. Standard of Review

■ Federal Rule of Civil Procedure 15 places leave to amend, after a brief period in which a party may amend as of right, within the sound discretion of the trial court. "In exercising this discretion, a court must be guided by the underlying purpose of rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *U.S. v. Webb,* 655 F.2d 977, 979 (9th Cir.1981) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Thus, rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality'." *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987). Amendment of the complaint is, however, subject to the qualification that it "not cause the opposing party undue prejudice, [citations omitted], is not sought in bad faith, [citation omitted], and does not constitute an exercise in futility. [Citation omitted.]" *Id.*

### 2. Proposed "Miscellaneous Amendments"

Plaintiffs seek leave to file a Second Amended Complaint ("SAC") (1) to make clear that they are "asserting that all of Microsoft's ink processing patents and patent applications derived in any way from the work of Aha!, Dan Altman, or Charlton Lui are subject to [plaintiffs'] tort claims in this lawsuit; and (2) to drop all infringement claims against defendant Greg Stikeleather." (Pl.'s Motion at 7:11–8:12) These requests are based on information discovered during recent depositions in this case. Defendants do not object to them, except to the extent that the proposed "clarifying" amendments apply to a proposed amendment, discussed *infra,* to include a new claim for tortious interference. Accordingly, the Court GRANTS plaintiffs' motion for leave to file a SAC that includes these miscellaneous amendments, except to the extent that they apply to a new claim for tortious interference. For the reasons set forth below, the Court DENIES plaintiffs' motion to file a SAC that includes a claim for tortious interfer-

---

constituted "a trade secret", because *inter alia* it was contained in a patent. The fact that the Order did not specifically state that Microsoft might show the information was contained in an Aha! patent does not preclude Microsoft from presenting such evidence.

The Order did not pretend or claim to list every possible form of evidence that Microsoft might present. Nor could it have done so given that the case then was in the very initial stages and no discovery had been conducted.

ence with contract and, consequently, the request to "clarify" that claim is moot. The Court also GRANTS the parties' joint request to permit the defendants to file amended answers and counterclaims in this action.

### 3. *Amendment to Include a Tortious Interference Claim*

As noted above, Plaintiffs seek leave to file a SAC that includes a seventh claim against Microsoft for tortious interference with contract. Microsoft opposes this request on the following grounds.

### a) The Statute of Limitations

■ Microsoft contends that a further amendment to include a claim for tortious interference with contract would be futile, and should be denied, because the claim is barred by the two-year statute of limitations. Microsoft is correct that an amendment to include a time-barred claim would be futile. *See, Sackett v. Beaman,* 399 f.2d 884, 892 (9th Cir.1968) (affirming denial of motion for leave to amend because statute of limitations rendered claim futile); *Chem v. New York Life Ins. Co.,* 1997 WL 792942, 1997 U.S.Dist. LEXIS 20054 (N.D.Cal. Oct. 21, 1997) (dismissing without leave to amend because statute of limitations rendered claim futile). Accordingly, the Court must determine whether the proposed seventh claim here is time-barred.

"A cause of action for interference with contractual relations is governed by the two-year limitations period of [California's Code of Civil Procedure] section 339, subdivision 1". *Richardson v. Allstate Ins. Co.,* 117 Cal.App.3d 8, 11–12, 172 Cal.Rptr. 423 (1981). "In general, a cause of action for wrongfully induced breach occurs at the date of the wrongful act." *Trembath v. Digardi,* 43 Cal.App.3d 834, 836, 118 Cal. Rptr. 124 (1974). In *Trembath, supra,* the California appeals court acknowledged the possibility, however, that the statute of limitations began to run when the contract was actually breached rather than when

the wrongful act inducing the breach occurred. *See id.* ("Clearly, the accrual date could not be later than the actual breach of the contract by the party who was wrongfully induced to breach"). Thus, "[plaintiffs] possessed a claim no later than the date of the alleged breach of contract." *Charles Lowe Co. v. Xomox Corp.,* 1999 U.S.Dist. LEXIS 203081, at *31 (N.D.Cal. Jan. 3, 2000) (relying on *Trembath, supra,* 43 Cal.App.3d at 836, 118 Cal.Rptr. 124).

■ Here, plaintiffs allege that Microsoft hired two former Aha! employees and then induced them to breach the June 1991 non-disclosure agreement between Aha! and plaintiffs by directing them to disclose and use plaintiffs' alleged trade secrets for Microsoft's own purposes. The evidence is undisputed that Microsoft hired these two individuals in April 1996, and that they began work in about July 1996. *See,* Pl.'s Motion at 2:15–17 (citing Lundwall Dec., Ex.s E (at 60–63) & F (at 94–96)). Plaintiff alleges (1) that Microsoft assigned the two former Aha! employees (a) to incorporate and develop Aha!'s ink processing technology into Microsoft's products, and (b) to assist in filing and prosecuting patent applications relating to ink processing work, and (2) that they complied, thereby breaching the 1991 non-disclosure agreement. (Pl.'s Motion at 3:1–5:24)

By plaintiffs' own admission, therefore, both the alleged wrongful act (Microsoft's hiring of the two former Aha! employees and assignment of them to work in areas that allegedly required them to improperly disclose and use plaintiffs' trade secrets) and the alleged breach (the former employees' alleged disclosure and use of that information) occurred in 1996, more than two years before plaintiffs filed this suit. Even assuming that the proposed claim for tortious interference with contract relates back to the date that plaintiffs filed this action, therefore, the claim still is time-barred and amendment to include it would be futile.

Plaintiffs strive to avoid this result by arguing that the "discovery rule" applies and that the statute of limitations did not accrue until they "discover[ed], or had reason to discover, the cause of action." *See, Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397, 87 Cal.Rptr.2d 453, 981 P.2d 79 (1999). This argument lacks merit, however, because the proposed tortious interference claim still would be time-barred even under this rule. In *Norgart, supra,* the California Supreme Court explained that a party "discovers" its claims, for statute of limitations purposes, when it suspects or has reason to suspect a factual basis for the elements of the claim. *Id.* at 397–98, 87 Cal.Rptr.2d 453, 981 P.2d 79 ("[T]he plaintiff discovers the cause of action when he at least suspects ... that someone has done something wrong to him", *i.e.*, "when he has notice or information of circumstances to put a reasonable person *on inquiry*") (emphasis in original, citations omitted).

Plaintiffs here had information of circumstances sufficient to put a reasonable person on inquiry in July of 1996 when they discovered that Aha! had sold its InkWriter product and rights to its pending patent applications to Microsoft. Forcier admittedly was concerned at this point that Microsoft might make use of the technology that he claimed Aha! had misappropriated. *See,* Forcier Dec. ¶¶ 36–38, Ex.s 15–17 (confirming that Forcier's attorney contacted Microsoft to advise it of his claims that Aha! had misappropriated his technology and infringed his patents). It would be reasonable in such circumstances also to suspect that Microsoft might hire some of Aha!'s employees who were knowledgeable about the InkWriter product to assist it in developing and marketing that product. The fact that plaintiffs failed "to seek to learn the facts necessary to bring the cause of action [for tortious interference]" did not toll the statute of limitations here. *See, Norgart, supra,* 21 Cal.4th at 397–98, 87 Cal.Rptr.2d 453, 981 P.2d 79 (a plaintiff "cannot wait [to investigate] and sit on his rights; he must go find [the facts necessary to bring the claim] if he can and file suit if he does").

For the reasons stated above, therefore, plaintiffs' claim for tortious interference is time-barred and an amendment to include it would be futile. Accordingly, the Court DENIES plaintiffs' motion for leave to amend.

### b) No Enforceable Contract Provision

Microsoft argues that leave to amend to include a claim for tortious interference with contract also must be denied because there was no valid contractual provision that actually was breached or disrupted. *See, Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998) (setting forth the elements of an intentional interference claim including, *inter alia*, a requirement that there be a valid contract). It cites two bases for this argument: (1) the confidentiality provision of the 1991 agreement had expired by the time that Microsoft hired the two former Aha! employees in April 1996, and (2) the restriction on commercial use contained in that agreement was void and unenforceable. (Microsoft's Opp. at 10:20–21:1) Plaintiffs do not contest the first basis for Microsoft's argument and, indeed, the undisputed facts confirm that they cannot.

■ The June 1991 agreement between Aha! and plaintiffs was an agreement to "maintain in confidence all proprietary information" that plaintiffs disclosed to Aha! pursuant to it. By its own terms, the Agreement was to "expire three (3) years from the date of the last disclosure" that plaintiffs made pursuant to it. (Forcier Dec.Ex. 4) Plaintiffs admit that they made no disclosures under this agreement after October of 1991. (Vandenberg Dec. ¶ 1, Ex.s 2, 3 (at 43:6–13), and 4 (at 16:13–14)) Consequently, the Agreement expired by its own terms during October of 1994, almost two years before Microsoft hired the two former Aha! employees.

Because no valid contract remained, plaintiffs cannot state a claim for tortious interference and, consequently, an amendment to include such a claim would be futile. *See, DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658–59 (9th Cir.1992) (proposed amendment would be futile because it failed to state a claim under California law).[4] The Court DENIES plaintiff's motion for leave to amend on this basis as well.

### c) Prior Breach

■ Microsoft also argues that amendment to include a claim for tortious interference with contract would be futile and therefore should be denied because the undisputed facts establish that plaintiffs cannot demonstrate causation. The Court concurs.

In order to plead interference with contract, plaintiffs must allege *inter alia* that the alleged breach of contract *"was caused by defendant's unjustified or wrongful conduct"*. *Dryden v. Tri–Valley Growers*, 65 Cal.App.3d 990, 995, 135 Cal.Rptr. 720 (1977) (emphasis in original). "It has been repeatedly held that a plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and abandoned· by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Id.* at 997, 135 Cal.Rptr. 720. In this case, plaintiffs cannot so allege because (1) according to its own allegations, Aha! breached the 1991 confidentiality agreement at least by 1993, *i.e.*, years before Microsoft allegedly induced Aha!'s former employees to breach it, and (2) as noted above, the agreement had expired by its own terms in October of 1994, again years before Microsoft allegedly became involved.

For these reasons also, the Court DENIES plaintiff's motion for leave to amend as futile.

### d) Undue Delay

■ Microsoft also argues that the Court should deny plaintiffs' request for leave to amend to add a tortious inference claim because plaintiffs delayed too long in bringing this claim. While it is true that the evidence suggests plaintiffs had notice of the facts that provide the basis for their proposed claim as early as August of 1998 (*i.e.*, before they filed their original complaint), the Court does not agree that it should deny plaintiffs leave to amend on this basis. The Ninth Circuit has ruled that "delay alone no matter how lengthy is an insufficient ground for denial of leave to amend." *Webb, supra,* 655 F.2d at 980. "Only where prejudice is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading" on this basis. *Howey v. U.S.,* 481 F.2d 1187, 1191 (9th Cir.1973). " 'The mere fact that an amendment is offered late in the case is … not enough to bar it.' " *Webb, supra,* 655 F.2d at 980 (quoting 3 Moore's Federal Practice § 15.08(4) at 15–102). Here, Microsoft has presented no evidence that it would be prejudiced by such an amendment. Nor does it appear that it would be, given that the trial date in this matter is almost a year away (October 29, 2001).

Accordingly, the Court REJECTS Microsoft's argument that it should deny plaintiffs' motion for leave to amend based on undue delay. The motion is DENIED on other grounds, however, as stated above.[5]

---

4. Given that the 1991 contract already had expired, the Court need not (and does not) address Microsoft's arguments concerning the validity of its terms.

5. Because the Court DENIES plaintiff's motion for leave to amend on three separate grounds, it need not address Microsoft's final argument that a tortious interference claim is barred by state and federal law. As noted above (in footnote 2), in order to rule on such an argument, the Court necessarily would have to rule on an issue of state law that has not previously been addressed or decided by

### III. *CONCLUSION*

For the reasons stated above, therefore, the Court GRANTS defendants' motions for summary judgment of plaintiffs' second, third, fourth, fifth, and sixth claims, DENIES defendant Aha!'s request for sanctions, GRANTS plaintiffs' motion to amend to include certain miscellaneous allegations, but DENIES the motion to the extent that plaintiffs seek to include a seventh claim for tortious interference, and GRANTS the parties request for an order permitting the defendants to file amended answers and counterclaims, and ORDERS that plaintiffs file their amended complaint within two weeks of the date that this Order is issued, and that defendants file their amended answers and counterclaims within four weeks of the date that this Order is issued.[6]

IT IS SO ORDERED.

any State court. Because such a ruling is not necessary here, the Court declines the opportunity to anticipate such a ruling.

6.  If for any reason, the parties conclude that they require additional time to file their amended pleadings, they may apply to the Court for an extension.